Scott WEAVER

v.

### AMERICAN POWER CONVERSION CORPORATION.

### No. 2004–44–Appeal.

Supreme Court of Rhode Island.

Dec. 15, 2004.

---

Brooks A. Magratten, Providence, for Plaintiff.

Stephen A. Rodio, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

PER CURIAM.

This matter came before this Court for oral argument on October 27, 2004, pursuant to an order directing the parties to appear and show cause why the issues raised by this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and that the case should be decided at this time.

### Facts and Procedural History

The plaintiff, Scott Weaver, appeals from a Superior Court entry of summary judgment in favor of defendant, American Power Conversion Corporation (APC or defendant). The plaintiff contends that summary judgment was improper because a genuine issue of material fact existed as to whether plaintiff, a former employee of defendant corporation, accepted a stock option offering from defendant to satisfy a preexisting obligation owed him by the corporation. The plaintiff also asserts that the motion justice misconstrued the doctrines of accord and satisfaction and novation in the summary disposition of his claim. For the reasons set forth herein, we deny plaintiff's appeal and affirm the judgment of the Superior Court.

In June 1991, APC offered plaintiff a position as a "sales application engineer" at its Rhode Island headquarters. Because plaintiff was residing in Colorado at the time of the offer, APC sales manager Asa Davis (Davis) telephoned plaintiff and informed him of the compensation and benefits for the position, which included an option to purchase 2,000 shares of APC stock if he left his current employment to accept the position at APC. Davis confirmed that offer in a letter sent to the plaintiff on June 19, 1991. In that letter, Davis wrote, in pertinent part:

"[t]his position involves an annual salary of $43,000. Salary reviews will occur at your first six-month anniversary of employment, with annual reviews thereafter. You will also be nominated [sic] to the Board of Directors to receive options to purchase 2,000 shares of APC stock under our Incentive Stock Option Program. This program gives you the option to purchase APC stock over a 4–year period at a price which is fixed at the closing price on the day you begin work at APC. Actual inclusion in the program is determined by a vote of the Board of Directors."[1]

The plaintiff accepted the offer and began work at APC on or about July 1, 1991. Later that fall, Davis informed plaintiff that he could expect paperwork for the option within the upcoming months. By December 1991, however, not having re-

---

1. At his deposition in this matter, Davis testified that APC employees were nominated to receive stock options as both a reward for exceptional job performance and as an inducement for prospective employees to join the company. Davis also testified that he was unaware of any employee who had worked for him being denied a stock option once that employee had been nominated to the board of the directors.

ceived any confirmation to that effect, plaintiff confronted Davis and asked about the status of his stock option. Davis informed him that his option was pending before the board and was probably "tied up in the lawyer's[,]" but assured plaintiff that it was forthcoming. In May 1992, still not having received any notification, plaintiff asked APC Chief Executive Officer Roger Dowdell about the status of his options. According to plaintiff, Dowdell "acted like he had no idea what I was talking about." Troubled with Dowdell's reaction, Weaver again contacted Davis, who promised him that he would look into the situation.

In June 1992, Davis informed Weaver that the APC board would be unable to grant the stock option as set forth in the June 19, 1991 letter because Weaver's name had not been included on the nominee list previously submitted to the board. To compensate plaintiff for that mistake, however, Davis ensured Weaver that he would be nominated at the next board meeting to receive an option to purchase 6,000 shares of APC stock. Davis testified that the offer for 6,000 shares was intended to "help [plaintiff] feel better" for not receiving the options earlier, considering that the stock had split two for one in December 1991.

The plaintiff was unhappy with Davis's offer and believed that it was not commensurate with the original proposal outlined in the June 19, 1991 letter confirming his employment. After preparing a spreadsheet detailing the fluctuating values of the stock, Weaver concluded that 12,000 options were necessary to equal the original offer and he informed Davis that he would "be willing to settle for" 12,000 shares if the new option grant was intended to be replacement for the original offer. On July 13, 1992, however, Davis e-mailed the following response: "Scott, I wish I had a better answer, but the best I can do is what I've outlined already. I think that, given time, the higher number of shares [6,000] will mean a much better result, especially over the long run."

In May 1992, APC tendered an Incentive Stock Option Agreement granting Weaver the option to purchase up to 6,000 shares of APC stock at $27.75 per share. Although plaintiff did not sign the stock option agreement, APC credited him for 6,000 shares in his employee account. Weaver thereafter began exercising his options, and he sold a vast majority of the stocks that he bought pursuant to the agreement, turning a profit of $394,958.96 in the process. Weaver terminated his employment with APC in September 1997 and commenced this action in June 2001.

The plaintiff's five-count amended complaint alleged breach of contract, unjust enrichment, estoppel, misrepresentation, and negligence, all stemming from defendant's failure to honor the promise made in the July 15, 1991 letter. In response, APC moved for summary judgment on two specific grounds. First, defendant maintained that the "second" offer of the option to purchase 6,000 shares was intended by APC to be a replacement for its original 2,000–share commitment, and plaintiff's exercise and acceptance of the 6,000–share option thus created an accord and satisfaction or a novation of the original contract between the parties. Secondly, defendant asserted that even if there was no accord and satisfaction or novation, the offer confirmation letter was insufficient to create a binding legal obligation on APC to grant plaintiff stock options for 2,000 shares. On that point, defendant argued that the letter fixed no date upon which plaintiff would be nominated to the board and specifically conditioned any stock option award on the vote of the board of directors. According to defendant, the let-

ter merely guaranteed that plaintiff would be nominated to receive stock options. The motion justice granted defendant's motion on the first ground, finding that the series of negotiations between the parties indicated that APC's 6,000–share offer was "in lieu of," "instead of," and "in place of" the original 2,000–share agreement, and that plaintiff's exercise of the options constituted a valid accord and satisfaction or novation of the previous agreement. The plaintiff filed a timely appeal to this Court.

### Standard of Review

■ "This Court reviews a grant of summary judgment on a *de novo* basis." *Johnson v. Newport County Chapter for Retarded Citizens, Inc.*, 799 A.2d 289, 291 (R.I.2002) (citing *Marr Scaffolding Co. v. Fairground Forms, Inc.*, 682 A.2d 455, 457 (R.I.1996)). "Accordingly, if our review of the admissible evidence viewed in the light most favorable to the nonmoving party reveals no genuine issues of material fact, and if we conclude that the moving party was entitled to judgment as a matter of law, we shall sustain the trial justice's granting of summary judgment." *Id.* (quoting *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I.1996)). "[A] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." *Accent Store Design, Inc.*, 674 A.2d at 1225. "The purpose of the summary-judgment procedure is to identify disputed issues of fact necessitating trial, not to resolve such issues." *Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I. 1996).

### Analysis and Discussion

The critical question in this case is whether plaintiff presented evidence suffi-cient to create a genuine issue of material fact as to whether the 6,000–share stock option agreement was intended by the parties to act as anything other than an accord and satisfaction or a novation of APC's original promise to nominate plaintiff to receive options to purchase 2,000 shares of APC stock. Because plaintiff has failed to present any such evidence, we are of the opinion that APC was entitled to summary judgment.

■ Black's Law Dictionary defines an "accord and satisfaction" as "[a]n agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance." Black's Law Dictionary 17 (7th ed. 1999). This Court has recognized that the "doctrine of accord and satisfaction provides that when two parties agree to give and accept something in satisfaction of a right of action which one has against the other, and that agreement is performed, the right of action is subsequently extinguished." *ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 313 (R.I.2001). A novation, on the other hand, is generally defined as "[t]he act of substituting for an old obligation a new one that either replaces an existing obligation with a new obligation or replaces an original party with a new party." Black's Law Dictionary 1091 (7th ed. 1999). A novation is therefore a "species" of accord and satisfaction. *Long v. Weiler*, 395 S.W.2d 234, 237 (Mo.Ct.App.1965). *See also* 66 C.J.S. *Novation* §§ 1–32 (1998). This Court has also characterized a novation as a "substituted contract." *Salo Landscape & Construction Co. v. Liberty Electric Co.*, 119 R.I. 269, 274 & n. 2, 376 A.2d 1379, 1382 & n. 2 (1977) (*Salo Landscape* ) (citing 6 *Corbin on Contracts*, § 1293 at 189–90 (1962)).

Because the two concepts are essentially intertwined, this Court has been described as having "manifested a concern with substance rather than form in this fuliginous corner of the law, hesitating to draw fine lines between these two closely allied kinds of contracts where no necessity exists for doing so." *In re Newport Plaza Associates, L.P.*, 985 F.2d 640, 644 (1st Cir.1993). Thus, in *Salo Landscape*, we overlooked fine common law distinctions between the two concepts:

> "it matters not whether we refer to this transaction as an accord and satisfaction or as a rescission followed by the formation of a new contract [novation]; the significant and essential element in either instance under the substituted contract theory is a factual determination that the original contractual rights and obligations of both parties were extinguished and new contractual rights and liabilities created for each, all by their mutual agreement." *Salo Landscape*, 119 R.I. at 273, 376 A.2d at 1382.

It is universally recognized that "[t]he process of making an accord, of interpreting the words and acts of the parties, and of determining the legal effect thereof, is the same as in the case of other contracts." 6 *Corbin on Contracts*, § 1277 at 117 (1962). "There must be *accompanying expressions sufficient to make the creditor understand*, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise." *Id.* at 118. (Emphasis added.) Similarly, "[i]t is frequently difficult to determine whether a new agreement is a substituted contract operating as an immediate discharge * * *." *Id.* § 1293 at 190. "It is wholly a question of intention, to be determined by the usual *processes of interpretation, implication, and construction.*" *Id.*

This Court has established that for parties to form a valid contract, each must have the intent to be bound by the terms of the agreement. *Rhode Island Five v. Medical Associates of Bristol County, Inc.*, 668 A.2d 1250, 1253 (R.I. 1996). "Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed." *Smith v. Boyd*, 553 A.2d 131, 133 (R.I.1989). For any contract to be enforceable, however, the parties must manifest their objective intent to be bound to the agreement. *See McGrath v. Rhode Island Retirement Board By and Through Mayer*, 906 F.Supp. 749 (D.R.I.1995), *affd*, 88 F.3d 12 (1st Cir.1996); *National Education Association–Rhode Island v. Retirement Board of Rhode Island Employees' Retirement System*, 890 F.Supp. 1143 (D.R.I.1995); *Smith v. Boyd*, 553 A.2d 131 (R.I.1989). Moreover, we have held that a novation "need not be expressly stated but can be shown by inference from the facts and from the conduct of the parties." *Jewel Co. of America, Inc. v. George*, 118 R.I. 372, 375, 373 A.2d 1200, 1202 (1977). Accordingly, to determine the intent of the parties to a substituted contract or an accord and satisfaction, this Court engages in an external interpretation of the party's or parties' intent as manifested by, among other things, actions, words, prior practice between the parties, practice in the trade or profession, and any statements made during negotiations. *Smith*, 553 A.2d at 133–34.

In the matter before us, the motion justice determined that plaintiff failed to present evidence sufficient to create a genuine issue of material fact as to whether the parties intended the second agreement to be anything other than a substitute for the previous obligation. We agree. This Court has firmly established that "[i]n op-

posing a motion for summary judgment, the nonmoving party may not rest upon the mere allegations, conclusions, or denials in her pleadings, but rather [he or] she has 'an affirmative duty to set forth specific facts that show that a genuine issue of fact exists to be resolved at trial.'" *Tavares v. Barbour*, 790 A.2d 1110, 1112–13 (R.I.2002) (quoting *General Motors Acceptance Corp. v. Johnson*, 746 A.2d 122, 123 (R.I.2000)).

Even reviewing the evidence in the light most favorable to the non-moving party, we hold that plaintiff failed to meet his burden. First, plaintiff's deposition testimony indicates that the 6,000–share offering was contemplated by both parties as a replacement for the original offer. Discussing his initial correspondences with Davis, plaintiff made the following statements:

> "[Davis] called me and said that [he had] good news and bad news. The bad news was that he couldn't get me the first option plan because it would mean restating earnings and they didn't want to do that. Earnings per share. So, he said, the good news was I got you a plan for more shares, three times the number of shares. And I said, great; so let's see; the stock has split, that's 4,000 shares, so you got me 12,000 shares. And he said, no. So, I said, so that means its only [fifty] percent more. And he said, yes, 6,000 shares. * * * And I told him, that doesn't sound like it's *comparable* to my original plan." (Emphasis added.)

Thereafter, the following exchange took place between defendant's counsel and plaintiff:

> "Q: All right. I didn't mean to suggest that you agreed that it was a substitute, but you understood, did you not, that APC was giving you [the second plan] as a substitute?

Mr. Magratten: Objection.

> "A: I don't know exactly what APC or Roger Dowdell or Asa Davis were thinking. In my opinion they thought that that's what they were doing.

> "Q: Yes. I understand. * * * The context of their offer to you of these 6,000 shares was as a replacement for the shares that had been promised you in your offer letter; isn't that fair?

Mr. Magratten: Objection.

> "A: No. * * *

> "Q: My question is a more practical one. Let me try it this way: You don't believe that you would have been offered 6,000 options in June or July of 1992 were it not for the fact that you hadn't been given the 2,000 options per your offer letter.

Mr. Magratten: Objection.

> "A: My answer is, why not?

> "Q: So you think that those options would have been offered to you anyway?

> "A: Could have been, sure.

> "Q: And the fact that you were comparing the new plan and old plan, using your terms, that was just for purposes of comparison? Why were you comparing them?

> * * *.

> "A: If I accepted the second plan as a replacement, then I wanted to have a comparison, yes."

Despite plaintiff's attempts to avoid providing direct answers to counsel's questions, a fair reading of his deposition leads only to the conclusion that plaintiff believed he was receiving the 6,000–share plan as a replacement for the earlier 2,000–share offer, and furthermore, knew that APC intended the second agreement to function to satisfy the outstanding obligation. More importantly, however, plaintiff's deposition is devoid of any evidence

that plaintiff in any way communicated or manifested any contrary intent to APC.

The e-mails and other correspondence between the parties similarly indicate an on-going negotiation process aimed at providing plaintiff with a replacement stock option scheme. Weaver's spreadsheet used the labels "old" and "new" to describe the two plans, while his e-mail of June 2, 1991 said that "the bottom line is that it really doesn't look like the 6,000 shares you've suggested is going to be very *comparable* to my original [2,000–share] offer." (Emphasis added.) Even when considered in the light most favorable to plaintiff, this correspondence indicates only that the parties each understood the second plan to be a substitute for the first.

■■■ We also have examined the statements set forth in plaintiff's affidavit, which was filed in opposition to defendant's motion for summary judgment. We are cognizant that in considering a motion for summary judgment, the court does not pass upon the weight and credibility of the evidence, but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion. *Palmisciano v. Burrillville Racing Association*, 603 A.2d 317, 320 (R.I.1992). Moreover, we are mindful that "[t]he purpose of summary judgment is issue finding, not issue determination." *Saltzman v. Atlantic Realty Co.*, 434 A.2d 1343, 1345 (R.I. 1981). However, we also have held that naked and conclusory assertions in an affidavit are inadequate to establish the existence of a genuine issue of material fact and thus do not afford a basis for reversal of a trial justice's ruling granting a motion for summary judgment. *Roitman & Son, Inc. v. Crausman*, 121 R.I. 958, 959, 401 A.2d 58, 59 (1979) (mem.); *Harold W. Merrill Post No. 16 American Legion v. Heirs–at–Law of Smith*, 116 R.I. 646, 648, 360 A.2d 110, 112 (1976). The obvious

rationale for this rule prevents a party from dodging summary disposition with factual assertions in tailor-made affidavits designed solely to create a mirage of material issues. In this case, plaintiff claimed in his affidavit that he understood the option granted in May 1992 to be an "incentive" for him to remain with APC, "and not in satisfaction of the option promised in [the original] July 19, 1991 letter." Yet, at no time during his deposition, upon repeated questioning about his impressions of the 6,000–share offering, did plaintiff make that assertion. Furthermore, irrespective of the subjective intent contended by the plaintiff in his affidavit, plaintiff offered no evidence indicating an actual manifestation of that intent to APC. The critical issue in this case is whether there was any objective manifestation of intent to create or repudiate an accord and satisfaction or a novation of the original agreement. It is apparent that plaintiff failed to embody the subjective intent referred to in his affidavit with any outward sign whatsoever. Therefore, his statement that he subjectively believed that the 6,000–share offering was an incentive for him to remain with the company did not create an issue of material fact capable of overcoming summary determination.

■■ In addition, the statements set forth in Weaver's affidavit, drawn specifically to frustrate summary judgment, do not square with his previous testimony. The United States Court of Appeals for the First Circuit has firmly established that when a party has given answers to unambiguous questions in discovery, that party cannot " 'create a conflict and resist summary judgment with an affidavit that is clearly contradictory,' unless there is a 'satisfactory explanation of why the testimony [has] changed.' " *Hernandez–Loring v. Universidad Metropolitana*, 233 F.3d 49, 54 (1st Cir.2000) (quoting *Colan-*

*tuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir.1994)). We are in full agreement with the holding of the First Circuit on this issue. The plaintiff's deposition testimony, which is replete with evasions and inconsistencies, does not contain a single reference to his contention that the 6,000–share plan was an incentive to remain with the company, as he states in the affidavit. The stark inconsistencies between plaintiff's deposition testimony and subsequently drafted affidavit thus presented defendant with a "constantly moving target" designed to make summary disposition impossible. *Hernandez–Loring*, 233 F.3d at 54. Furthermore, plaintiff has offered no explanation for the apparent change in his testimony. Accordingly, we hold plaintiff's affidavit both ineffectual and insufficient to establish the existence of a genuine issue of fact in this case.

In our opinion, APC was entitled to summary judgment as a matter of law. From our examination of the record, it is clear that the actions, words, and dealings of the parties manifested a mutual intent to bargain toward an acceptable replacement plan. Since the record contains no evidence that the plaintiff outwardly communicated a contrary intent to APC, we are of the opinion that a fact finder could conclude only that the 6,000–share offering was intended to be a substitute for the original 2,000–share agreement, and that the plaintiff accepted and took advantage of the substitution after prolonged discussions and e-mails with Davis to that effect. Because we reach this conclusion, we need not address the defendant's contention that the employment confirmation letter was insufficient to create a binding legal obligation on APC.

## Conclusion

For the foregoing reasons, we affirm the Superior Court judgment and remand the record in this case thereto.