DECISION
Before this Court are three motions for summary judgment, each made pursuant to Super. R. Civ. P. 56. The plaintiff, Howard S. Cohen ("Cohen"), moves for partial summary judgment as to Counts II and III of his amended complaint. Defendants, GTECH Corp. and GTECH Holdings Corp. (hereinafter collectively "GTECH"), move for summary judgment as to the first five Counts of the complaint, while defendants, Michael J. Tuchman ("Tuchman") and Levenfeld Pearlstein Glassberg Tuchman Bright Goldstein Schwartz, LLC ("Levenfeld Pearlstein"), move for summary judgment on Counts VI and VII. This Court's jurisdiction is predicated on G.L. 1956 §8-2-14.
 FACTS AND TRAVEL
On March 5, 2001, Cohen and GTECH entered into an Employment Agreement (hereinafter "Employment Agreement"), confirming that he would be CEO of GTECH as of March 12, 2001. The Employment Agreement, in addition to detailing Cohen's salary and benefits, also delineated how future stock options were to be awarded to the plaintiff.
In particular, Section 6(c)(iii)[1] of the Employment Agreement stated that future stock options were to be awarded under GTECH's 2000 Omnibus Stock Option and Long-Term Incentive Plan ("2000 Plan"). According to this provision, any future stock option agreement was to contain terms that were "essentially" the same as those set forth in Appendix A of the Employment Agreement, which noted that options "shall remain exercisable for a period of one year." Likewise, said Section also noted that all future stock option grants would have terms "substantially similar" to the stock option agreement that was attached as Appendix D.[2] The language in Appendices D and A differed from the language in GTECH's 2000 Plan, which permitted stock options to be exercisable for only six months after termination of employment.[3]
On March 5, 2001, GTECH granted Cohen, pursuant to a stock option agreement (hereinafter "2001 Stock Option Agreement" or "2001 SOA"), stock options for 400,000 shares. Although the language originally contained the six month exercise period, in accordance with the 2000 Plan, the 2001 SOA was amended to contain a one year exercise period, conforming with the Employment Agreement.
On April 3, 2002, under a second stock option agreement (hereinafter "2002 Stock Option Agreement" or "2002 SOA"), GTECH granted Cohen an additional 450,000 stock options. This grant provided for a six month exercise period. Again, this language, while the same as the 2000 Plan, did not match the language in Section 6(c)(iii), Appendix A, or Appendix D of the Employment Agreement. Cohen alleges that he brought this discrepancy to the attention of GTECH's General Counsel, Marc A. Crisafulli ("Crisafulli"), who agreed to fix it. Crisafulli denies the conversation took place.[4]
On August 6, 2002, Cohen was terminated from GTECH. That day, Cohen contacted Michael J. Tuchman ("Tuchman"), a partner at the Illinois law firm of Levenfeld Pearlstein who had worked for Cohen on prior employment negotiations. Tuchman claims that he advised Cohen that it was not yet appropriate to begin, in earnest, discussions or negotiations regarding his termination and rights thereunder.
Sometime thereafter, Cohen hired Charlene F.L. Marant ("Marant") (apparently a law school graduate) as an advisor in connection with severance negotiations. Tuchman continued to work for Cohen, drafting, in particular, a summary or abstract of Cohen's rights under the original Employment Agreement. That document summarized both the 2001 SOA and 2002 SOA. Tuchman, who claims to have never read the 2002 SOA, incorrectly noted in the summary that the terms of the 2002 SOA contained a one year stock option exercise period, when, in fact, it allowed for only six months.
During these early negotiations with GTECH, Tuchman successfully argued that Cohen was fired in violation of a 60 day notice provision in the Employment Agreement. GTECH agreed to alter the termination date to October 5, 2002, 60 days after the August 6, 2002 date. Marant, however, had the termination date officially changed to August 7, 2002. Tuchman alleges that, after October 15, 2002, neither he nor anyone at Levenfeld Pearlstein performed any further work for Cohen.
Around this time, Marant began negotiating a separation agreement directly with GTECH. The agreement, entitled Separation Agreement and Mutual Release (hereinafter "Separation Agreement"), was executed on December 13, 2002. The terms of the Separation Agreement not only released the parties from their obligations under the Employment Agreement, but also mandated that stock options were to be exercised in accordance with the terms of the 2001 SOA and the 2002 SOA.
The Separation Agreement also noted that Cohen was not to contact anyone at GTECH directly, and that he was only to contact GTECH's attorneys. Attorney Walter Reed ("Mr. Reed") was named a primary contact. Cohen emailed Mr. Reed regarding a variety of issues that arose surrounding the Separation Agreement. In particular, on January 10, 2003, Cohen emailed Mr. Reed stating that he contacted the Bank of New York ("BNY" or "Bank"), where Cohen's stock option shares were held, but that the Bank stated that his options were not yet vested. In that email he wrote:
 "Walter, I left you a phone message. As of today at 2:00 the BNY does not have notification that my 750,000 options are fully vested, nor do they have notification that my 90,000 restricted shares are vested. The agreement in effect and dated Jan. 6, 2003 to the best of my understanding has both fully vested as of the effective date. IS THIS CORRECT? If so why has GTECH not acted accordingly. Have they already breached the contract agreement. Could you please let me know what is going on.
 WHAT IF I HAD TO SELL THE STOCK TODAY JOHN TAYLOR OF BNY SAYS I WOULD NOT HAVE BEEN ABLE TO DO SO HOW WOULD YOU HANDLE THIS ?" [Emphasis in original.]
Cohen sent another email asking Mr. Reed to have all his shares delivered to the Bank, and then asked why his 750,000[5]
options did not vest when he signed the Separation Agreement. Mr. Reed contacted the Bank, which then vested Cohen's shares.
On March 5, 2003, Cohen attempted to exercise all 750,000 of his stock options. He was unable, however, to exercise 450,000 options granted under the 2002 SOA. GTECH refused this request, stating that the exercise period had ended on February 7, 2003, six months after the agreed upon termination date of August 7, 2002.
The Plaintiff filed his original complaint on May 19, 2003, which was later amended on August 26, 2004. The amended complaint has eight Counts: Count I alleges a general breach of contract claim against GTECH; Counts II, III, and IV allege mutual mistake as to the 2002 SOA, the Separation Agreement, and the Employment Agreement, respectively; Count V alleges that GTECH breached a fiduciary duty owed to the plaintiff by failing to notify Cohen that he had only six months to exercise stock options granted under the 2002 SOA; Count VI avers that Marant, Tuchman, and Levenfeld Pearlstein breached their duty of care by incorrectly advising him as to his rights under the Separation Agreement and the 2002 SOA; Count VII posits that Marant, Tuchman, and Levenfeld Pearlstein engaged in the unauthorized practice of law in violation of G.L. 1956 § 11-27-12; and Count VIII asks the court to declare the rights of the parties under the 2000 Plan, the Employment Agreement, the 2001 SOA, the 2002 SOA, and the Separation Agreement.
GTECH filed a timely objection, and filed a Counterclaim, alleging a breach of contract with respect to the Separation Agreement. Tuchman and Levenfeld Pearlstein filed an answer and a Counterclaim on August 6, 2003. Defendant Marant has not filed any answer.
In September of 2005, Cohen made a motion for partial summary judgment as to Counts II and III of the amended complaint. GTECH responded and filed a motion for summary judgment on Counts I,[6] II, III, IV, and V, as well as to its Counterclaim. Tuchman has moved for summary judgment as to Counts VI and VII of the amended complaint. This decision addresses these three motions.
 STANDARD OF REVIEW
It is well settled that "[s]ummary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter . . . that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v. BurrillvilleRacing Association, 603 A.2d 317, 320 (R.I. 1992) (citingSteinberg v. State, 427 A.2d 338 (R.I. 1981); Ludwig v.Kowal, 419 A.2d 297 (R.I. 1980)); see also Super. Ct. R. Civ. P. Rule 56. During a summary judgment proceeding "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Palmisciano,603 A.2d at 320 (citing Lennon v. MacGregor, 423 A.2d 820 (R.I. 1980)). The Court's purpose during the summary judgment procedure is issue finding, not issue determination. Industrial NationalBank v. Peloso, 121 R.I. 305, 397 A.2d 1312, 1313 (R.I. 1979) (citing O'Connor v. McKanna, 116 R.I. 627, 359 A.2d 350 (R.I. 1976); Slefkin v. Tarkomian, 103 R.I. 495, 238 A.2d 742 (R.I. 1968)). Thus, the only task of a trial justice in ruling on a summary judgment motion is to determine whether there is a genuine issue concerning any material fact. Industrial NationalBank, 397 A.2d at 1313 (citing Rhode Island Hospital TrustNational Bank v. Boiteau, 119 R.I. 64, 376 A.2d 323 (R.I. 1977)).
However, "a party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." Weaver v. Am. Power Conversion Corp.,863 A.2d 193, 197 (R.I. 2005) (quoting Accent Store Design, Inc.,674 A.2d 1223, 1225 (R.I. 1996)). Thus, "they have an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." Bourg v. Bristol Boat Co.,705 A.2d 969 (R.I. 1998) (citing St. Paul Fire Marine Insurance Co. v.Russo Brothers, Inc., 641 A.2d 1297, 1299 (R.I. 1994)).
 ANALYSIS I. Contractual Interpretation and Mutual Mistake
The Plaintiff seeks the reformation of three agreements: the Employment Agreement, the 2002 SOA, and the Separation Agreement. These three documents are each interrelated. The Employment Agreement, by its terms, contemplated future stock option agreements like the 2002 SOA. The Separation Agreement expressly addresses both documents — it releases the parties from their obligations under the Employment Agreement, but affirms the full force and effect of the 2002 SOA as an instrument pursuant to which Cohen still retained rights. In essence, Plaintiff asks this Court to reform these agreements because he claims that the parties labored under mutual mistake as to certain relevant terms. GTECH claims that the Separation Agreement is controlling, and that its terms should be upheld because they are clear and unambiguous.
This Court concludes that the terms of the Separation Agreement are clear and unambiguous. GTECH has been released from its obligations under the Employment Agreement, and, by the terms of the Separation Agreement, the 2002 SOA remains in full force and effect. Accordingly, Cohen's request for reformation of the Employment Agreement must fail: summary judgment in favor of GTECH is appropriate as to Count IV of the plaintiff's complaint.[7]
Contract terms must be assigned their plain and ordinary meanings. See Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004). If the contract terms are clear and unambiguous, judicial construction is at an end and the terms will be applied as written. See W.P. Assocs. v. Forcier, Inc., 637 A.2d 353, 356
(R.I. 1994). Whether a term is clear or ambiguous is a question of law that is confined to the four corners of the agreements.See Rivera, 847 A.2d at 284. Ambiguity occurs only when the contract term is "reasonably and clearly susceptible of more than one interpretation." Rubery v. Downing Corp., 760 A.2d 945, 947
(R.I. 2000) (quoting Rotelli v. Catanzaro, 686 A.2d 91, 94
(R.I. 1996)). Likewise, "a party who signs an instrument manifests his assent to it and cannot later complain that he did not read the instrument or that he did not understand its contents." Kottis v. Cerilli, 612 A.2d 661, 668 (R.I. 1992) (quoting F.D. McKendall Lumber Co. v. Kalian, 425 A.2d 515,518 (R.I. 1981)). Section 3 of the Separation Agreement states, in relevant part:
 "Except as specifically provided in this Agreement and the `Executive's Stock Related Agreements' (as defined in Section 6(g) hereof), the Executive hereby IRREVOCABLY AND UNCONDITIONALLY RELEASES, ACQUITS, FOREVER FULLY DISCHARGES AND COVENANTS NOT TO SUE OR OTHERWISE PARTICIPATE IN ANY ACTION AGAINST the Company . . . for any actions or omissions, whether known or unknown, that arise from, relate to, or are in any way connected with: (a) the negotiation, documentation, execution and performance (and failure of performance) of any aspect of the Employment Agreement." [Emphasis in original.]
This language makes clear that the parties agreed to fully release GTECH from any obligations it owed to Cohen under the Employment Agreement. As such, reformation of this agreement would be an exercise in futility, because GTECH is no longer bound by its terms.
The fact that this Court has found that the terms of the Separation Agreement are clear and unambiguous (and that reformation of the Employment Agreement is therefore not appropriate) does not alter this Court's analysis and approach to the plaintiff's claim for reformation of the 2002 SOA. To the contrary, this Court holds that there still remains genuine issues of material fact surrounding the terms of the 2002 SOA sufficient to preclude summary judgment as to Count II of the plaintiff's amended complaint.
A mutual mistake is a mistake "common to both parties wherein each labors under a misconception respecting the terms of the written agreement sought to be cancelled." Rivera v. Gagnon,847 A.2d 280, 284 (R.I. 2004). While a mutual mistake is grounds for reformation, a unilateral mistake in the formation of a contract affords the mistaken party no relief. McEntee v.Davis, 861 A.2d 459, 463 (R.I. 2004). To permit reformation, it must appear that the parties' agreement fails in some material respect to reflect correctly their prior understanding. SeeYates v. Hill, 761 A.2d 677, 680 (R.I. 2000); Dubreuil v.Allstate Insurance Co., 511 A.2d 300, 302-03 (R.I. 1986);Hopkins v. The Equitable Life Assurance Society of the UnitedStates, 107 R.I. 679, 685, 270 A.2d 915, 918 (1970). "There can be no reformation unless the variance between what is written and what was originally intended, as well as the mutual mistake, are demonstrated by clear and convincing evidence." Leiter v.Allstate Insurance Co., 725 A.2d 882, 884 (R.I. 1999) (quotingHopkins v. Equitable Life Assurance Society of the UnitedStates, 107 R.I. 679, 685, 270 A.2d 915, 918 (1970)).
Even though GTECH moves for summary judgment as to the reformation claim on the 2002 SOA, it admits, in its own memorandum, that there are genuine issues of material fact surrounding the intent of the parties. The Court agrees, and declines to grant either party's motion for summary judgment as to Count II of the plaintiff's complaint. GTECH's General Counsel contends that Cohen knew of the six month language, and that it was Cohen who in fact requested the six month terms. Conversely, Cohen claims that he asked GTECH's General Counsel to change the six month language in the 2002 SOA. But GTECH asserts that a paralegal has stated that Cohen told her, after the Separation Agreement was executed, the he knew he had six months to exercise the stock options granted under the 2002 SOA. Accordingly, the Court, having considered these allegations in a light most favorable to the non-moving party, concludes that genuine issues of material fact remain as to the parties intent under the terms of the 2002 SOA.
With respect to the Separation Agreement, it is not clear to the Court what terms, if any, Cohen seeks to reform. In Count III of the plaintiff's amended complaint, Cohen asserts that "the Separation Agreement and Mutual Release does not accurately reflect the intent of the parties and should be reformed to provide for a one-year exercise period." This contention neglects to recognize both that the Separation Agreement does not contain the six month stock option exercise language and that Cohen's rights to exercise the stock options flowed from the 2002 SOA, not the Separation Agreement.[8] The Separation Agreement merely preserved the full force and effect of the 2002 SOA.[9] For this reason, the Court grants GTECH's motion for summary judgment on Count III of the plaintiff's amended complaint. If there is a mutual mistake as to the time frame in which Cohen could have exercised his stock options under the 2002 SOA, the mistake goes to the intent of the parties as they pertain to the terms of the 2002 SOA.
 II. Duty of Contractual Fair Dealing and Good Faith The plaintiff alleges that GTECH breached its fiduciary duty, violating an implied contractual duty of good faith and fair dealing, when GTECH failed to notify him that he had 6 months to exercise his stock options under the 2002 SOA. GTECH claims that, pursuant to the terms of the Separation Agreement, it had no affirmative duty to communicate with Cohen.
A fiduciary duty arises only when a special relationship of trust and confidence exists that requires a fiduciary to act in the other party's best interest. See Fraioli v. Lemcke, 328 F. Supp. 2d 250, 267 (D.R.I. 2004). Whether there is a confidential relationship is a question of fact. See A.Teixeira Co. v. Teixeira, 699 A.2d 1383, 1387 (R.I. 1997). It is axiomatic that a duty of implied good faith and fair dealing is required of parties to a contract. See DovenmuehleMortgage, Inc. v. Antonelli, 790 A.2d 1113, 1115 (R.I. 2002). Whether GTECH breached its duty of contractual good faith and fair dealing is a disputed genuine issue of material fact. As a party to the Separation Agreement, GTECH did owe Cohen a duty of good faith and fair dealing, but it can not be said, as a matter of law, whether that duty was breached when GTECH's counsel allegedly failed to respond to a question regarding the vesting of his stock option shares under the 2002 SOA. In particular, it is unclear whether Cohen specifically asked GTECH's attorneys about the stock option exercise period. Accordingly, summary judgment is inappropriate on Count V of the plaintiff's amended complaint.
 III. Malpractice
The plaintiff asserts that Tuchman and Levenfeld Pearlstein are liable for legal malpractice because Cohen relied on a summary which incorrectly referenced the stock option exercise period listed in the 2002 SOA. For the reasons below, the Court concludes that genuine issues of material fact remain as to whether Tuchman and Levenfeld Pearlstein breached their duty of care owed to Cohen, and whether the summary or abstract was a proximate cause of Cohen's injuries.
To be successful in an action for attorney malpractice, "a plaintiff must prove by a fair preponderance of the evidence not only a defendant's duty of care, but also a breach thereof and the damages actually or proximately resulting therefrom to the plaintiff." Laurence v. Sollitto, 788 A.2d 455, 459 (R.I. 2002) (quoting Macera Brothers of Cranston, Inc. v. Gelfuso Lachut,Inc., 740 A.2d 1262, 1264 (R.I. 1999)). The "[f]ailure to prove all three of those required elements, acts as a matter of law, to bar relief or recovery." Id. The general rule is that a lawyer is held to that degree of care, skill, diligence, and knowledge commonly possessed and exercised by a reasonable, careful, and prudent lawyer in the practice of law in the jurisdiction. SeeHolmes v. Peck, 1 R.I. 242, 245 (1849) (determining that the duty an attorney owes to his client is to deliver the requisite "ordinary skill and care in the management of the business entrusted to him").
In essence, Tuchman and Levenfeld Pearlstein claim that the plaintiff has failed to show that they are liable for a negligent breach of care because they did not represent the plaintiff when he drafted or negotiated the Employment Agreement, 2001 SOA, 2002 SOA, and the Separation Agreement. In particular, they allege that Marant is responsible for drafting the Separation Agreement and for having the termination date changed from October 5, 2002 to August 7, 2002, thus altering the dates upon which Cohen could have exercised his stock options.[10] At this time, the Court declines to rule, as a matter of law, that Tuchman and Levenfeld did not breach a duty of care owed to the plaintiff. To do so would require this Court to assess the reasonableness of their actions.
Tuchman and Levenfeld Pearlstein also argue that they were not the proximate cause of the Plaintiff's harm. Instead, they aver that Marant's actions regarding the Separation Agreement acted as a superceding, intervening cause. In particular, they allege that it was not reasonably foreseeable that Marant would fail to preserve the one year language in the Employment Agreement, or that she would have changed the termination date.
An "[i]ntervening cause exists when an independent and unforeseeable intervening or secondary act of negligence occurs, after the alleged tortfeasor's negligence, and that secondary act becomes the sole proximate cause of the plaintiff's injuries."Contois v. Town of West Warwick, 865 A.2d 1019, 1027 (R.I. 2004). If the original conduct was "totally inoperative as a cause of the injury," then the intervening cause becomes the sole proximate cause of injury. Id. But "[i]f the independent or intervening cause is reasonably foreseeable, the causal connection remains unbroken." Seide v. State, 875 A.2d 1259,1270 (R.I. 2005) (quoting Almeida v. Town of North Providence,468 A.2d 915, 917 (R.I. 1983)). Generally, whether an intervening cause was foreseeable is not the province of the trial justice but is a question of fact that should be submitted to the jury.See Pantalone v. Advanced Energy Delivery Systems, Inc.,694 A.2d 1213, 1216 (R.I. 1997).
As the Rhode Island Supreme Court stated in Pantalone, the foreseeability of an alleged intervening cause is not generally a question for the trial justice, but is left for the jury. Thus, whether Marant's actions — changing the termination date and negotiating the Separation Agreement — constitute a foreseeable intervening cause is a question this Court can not answer as a matter of law. Having examined the memoranda, pleadings, and affidavits in a light most favorable to the plaintiff, defendants Tuchman and Levenfeld Pearlstein's motion for summary judgment as to Count VI of the plaintiff's amended complaint must be denied. The foreseeability and effect of Marant's acts are genuine issues of material fact.
 IV. Unauthorized Practice of Law
Finally, the Plaintiff avers that Tuchman engaged in the unauthorized practice of law in Rhode Island, in violation of G.L. 1956 § 11-27-12[11] — a crime. Pursuant to G.L. 1956 §9-1-2,[12] Cohen seeks civil damages for the alleged violation and injury that may have resulted[13] from this crime. In essence, the plaintiff claims that Tuchman and Levenfeld Pearlstein violated § 11-27-12 when they assumed to be and/or held themselves out[14] to the public as persons who were entitled to practice law[15] in Rhode Island. Specifically, the plaintiff contends that Tuchman's drafting of the summary or abstract of Cohen's rights under the Employment Agreement and the 2002 SOA was tantamount to the unauthorized practice of law. In support of this contention, the plaintiff points to the fact that GTECH is located in Rhode Island, that Cohen is a Rhode Island resident, and that the choice of law provision in the Separation Agreement subjects legal disputes between parties to the jurisdiction of this state.
Tuchman responds by claiming that Cohen can provide no evidence that Tuchman held himself out to be an attorney practicing in Rhode Island. Likewise, Tuchman declares that, under the Plaintiff's interpretation, all choices of law clauses would invoke unauthorized practice of law violations. See, e.g.,Fought Co. v. Steel Eng'g Erection, 87 Haw. 37,951 P.2d 487 (1998) (stating that courts should be wary of taking restrictive interpretations of unlawful practice provisions because it might unreasonably impose limitations on lawyer's ability to render services on inter-jurisdictional matters).
"It has long been the law of this state that the definition of the practice of law and the determination concerning who may practice law is exclusively within the province of" the Rhode Island Supreme Court. Unauthorized Practice of Law Comm. v.Department of Workers' Compensation, 543 A.2d 662, 664 (R.I. 1988). For the purposes of this decision, the "practice of law" is as defined by § 11-27-2. In short, Tuchman's actions, in drafting a summary or abstract, do not constitute the practice of law in Rhode Island as defined by this statute. According to the plain language of § 11-27-2, an individual must do or commit some action that: is "incident[al] to any action or other proceeding of any kind before or to be brought before the court or other body;" "pertaining to a law question or a court action or judicial proceeding brought or to be brought;" dispositive "of any civil or criminal case or cause of action;" or is akin to preparing or drafting an instrument "which requires legal knowledge and capacity and is usually prepared by attorneys at law." [Emphasis added.] Drafting a summary of a stock option agreement does not fall into any of the four categories: the summary is not incidental to an action or proceeding brought or to be brought before a court; it does not pertain to a law question or a judicial proceeding brought or to be brought, it is not dispositive of any civil or criminal case or cause of action; and it is not an instrument which requires legal knowledge to draft or prepare. As to this last point, it should be noted that Cohen admits that he, as a non-lawyer, negotiated the 2001 SOA and the 2002 SOA without the assistance or counsel of an attorney. This fact, in and of itself, shows that legal knowledge is not required to understand and craft a stock option agreement. By extension, drafting a summary of stock option agreement does not require legal knowledge such that it constitutes the practice of law as defined by § 11-27-2. Accordingly, the plaintiff's attempt to hold Tuchman liable for purportedly holding himself out as an attorney "competent, qualified, authorized, or entitled to practice law" in Rhode Island must fail, because it can not be shown that his actions constituted the "practice of law."[16]
 CONCLUSION
For the reasons stated above, Counts II, V, and VI survive the motions for summary judgment. Conversely, this Court grants summary judgment as to Counts III, IV, and VII in favor of the defendants.
Counsel shall enter an appropriate order consistent with this decision.
[1] Section 6(c)(iii) states, in part:
 "(c) Stock Options. Executive shall receive the following stock options in accordance with the following terms and conditions:
 . . . .
 (iii) All grants of options under this Agreement are subject to and conditioned upon the Company obtaining all necessary shareholder approvals, which Company shall use all reasonable efforts to obtain. Each time Executive receives a grant of stock options pursuant to this Section 6(c), he shall be asked to enter into the Company's standard Non-Qualified Stock Option Agreement (the "Option Agreement") which shall set forth the terms and conditions governing the grant and exercise of the Options including such terms as are set forth in this Section 6(c) and which Option Agreement with respect to the option grants under the 2000 Plan shall be substantially similar to the Option Agreement attached hereto as Appendix D. The terms and provision of the options provided for in this subsection (c) shall be essentially as set forth in Appendix A hereto."
[2] Appendix D is the 2001 SOA, which, by its terms, also contains a one year exercise period.
[3] Section 6(b)(vi) of the 2000 Plan states, in relevant part:
 "Unless otherwise determined by the Committee at or after Grant, if an optionee's employment with the Company and its Affiliates is terminated for any reason other than for Cause, no further installments of his or her Option shall become exercisable after such termination of employment and his or her Options which are then exercisable shall terminate on the earlier of (A) six (6) months (three months if the Option is an Incentive Option unless such Incentive Option has been converted into a Non-Qualified Option) following the date of the Optionee's termination of employment with the Company and its Affiliates or (B) the specified expiration date of the Option."
[4] Although Cohen admits that he never brought the matter to Crisafulli's attention after this one alleged instance, a GTECH paralegal wrote in a March 5, 2003 memorandum (after Cohen's termination and the execution of the Separation Agreement) that Cohen stated that he believed the six month time period began to run when the Separation Agreement was signed, and not at the termination of employment. Accordingly, GTECH alleges that Cohen was aware of the six month language contained in the 2002 SOA.
[5] Cohen was able to successfully exercise 300,000 options that are not pertinent to this suit.
[6] Neither party directly addresses Count I in their memoranda. For this reason, the Court declines to make a ruling, at this time, on this Count.
[7] This Court reserves ruling on GTECH's counterclaim for breach of the Separation Agreement at this time.
[8] In fact, Section 6(f) of the Separation Agreement acknowledges this fact, stating that "[n]othing in this Agreement is intended to amend or alter the Executive's Stock Related Agreements which remain in full force and effect in accordance with their terms."
[9] By extension, the Separation Agreement must also preserve the plaintiff's right to attempt to have the 2002 SOA reformed under the legal theory of mutual mistake, because this is a right Cohen possessed before he entered into the Separation Agreement, and it is a right which was not expressly released by the Separation Agreement. To this point, GTECH argues that the Separation Agreement acted as a compromise and settlement of all claims and causes of action, thus foreclosing any mistake and reformation claims as to the 2002 SOA. See Weaver v. AmericanPower Conversion Corp., 863 A.2d 193 (R.I. 2004) (claims extinguished by subsequent agreement); Kendall v. Rossi,35 R.I. 451, 87 A. 186 (1913) (merger and bar). GTECH avers that Cohen received the benefit of certain payments in the Separation Agreement, in consideration for being released from the Employment Agreement. Accordingly, they urge that Cohen is barred from raising claims that should have been brought before the Separation Agreement was executed. In response, Cohen argues that he never intended to waive any rights he had under the 2002 SOA when he signed and executed the Separation Agreement. He notes that Kendall and Weaver stand only for the proposition that a "change of position" is legal consideration to support a new agreement which the parties clearly intended to be in substitution for a prior agreement. The Court agrees with the plaintiff's reading of these cases. As the Court in Weaver
stated:
 "[I]t matters not whether we refer to this transaction as an accord and satisfaction or as a rescission followed by the formation of a new contract [novation]; the significant and essential element in either instance under the substituted contract theory is a factual determination that the original contractual rights and obligations of both parties were extinguished and new contractual rights and liabilities created for each, all by their mutual agreement." 863 A.2d 193, 198 (R.I. 2004) (quoting Salo Landscape Construction Co. v. Liberty Electric Co., 119 R.I. 269, 274, 376 A.2d 1379, 1382
(1977)).
There is no evidence that the parties intended to extinguish Cohen's rights under the 2002 SOA. On the contrary, the Separation Agreement explicitly provides that Cohen's rights under the 2002 SOA remained unaffected.
[10] To this point, Tuchman espouses an agency, co-agency theory of attorney representation, stating that when there is more than one attorney representing a client, a "co-agent" attorney is not liable for the other "co-agent" attorney's misconduct. See, generally, George M. Cohen, TheMultilawyered Problems of Professional Responsibility, 2003 U. Ill. L. Rev. 1409 (2003). The Court declines to adopt the novel approach espoused in both the article and the defendant's memorandum.
[11] Section 11-27-12 states:
 "No person, except a duly admitted member of the bar of this state, whose authority as a member to practice law is in full force and effect, shall assume to be an attorney or counselor at law or hold himself or herself out in any manner to the public or to another person as being competent, qualified, authorized, or entitled to practice law in this state."
[12] Section 9-1-2 states:
 "Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made; and whenever any person shall be guilty of larceny, he or she shall be liable to the owner of the money or articles taken for twice the value thereof, unless the money or articles are restored, and for the value thereof in case of restoration."
[13] Tuchman maintains that any damages he might be civilly liable for should be capped at five hundred dollars. See §11-27-14 (stating that first time offenders are limited to a five hundred dollar fine). Tuchman would be correct if the claim against him was brought by the state as a criminal charge. Here, Cohen has brought a civil action, and is therefore not bound by penalties and fines mandated by the criminal statute.
[14] Section 11-27-1 states:
 "(a) `Hold himself or herself out' as used in this chapter includes the following: the assumption, use, or advertisement of the title of lawyer, attorney, attorney at law, counselor, counselor at law, solicitor, or any term or terms conveying the idea that the person in connection with whose name they or any of them are used is competent, qualified, authorized, or entitled to practice law, or the use of any kind of sign, token, symbol, card, letterhead, envelope, stationery, circular, or other writing, printing, or painting, or any representation by word or act, the purpose or tendency of which is to convey that idea.
 (b) `Person' when used in the phrase `another person' in this chapter, unless the context otherwise requires, includes partnerships, corporations, and associations."
[15] Section 11-27-2 sates:
 "`Practice law' as used in this chapter means the doing of any act for another person usually done by attorneys at law in the course of their profession, and, without limiting the generality of the definitions in this section, includes the following:
 (1) The appearance or acting as the attorney, solicitor, or representative of another person before any court, referee, master, auditor, division, department, commission, board, judicial person, or body authorized or constituted by law to determine any question of law or fact or to exercise any judicial power, or the preparation of pleadings or other legal papers incident to any action or other proceeding of any kind before or to be brought before the court or other body;
 (2) The giving or tendering to another person for a consideration, direct or indirect, of any advice or counsel pertaining to a law question or a court action or judicial proceeding brought or to be brought;
 (3) The undertaking or acting as a representative or on behalf of another person to commence, settle, compromise, adjust, or dispose of any civil or criminal case or cause of action;
 (4) The preparation or drafting for another person of a will, codicil, corporation organization, amendment, or qualification papers, or any instrument which requires legal knowledge and capacity and is usually prepared by attorneys at law."
[16] The Court feels that this reading of the statute comes closer to the American Bar Association's ("ABA") Model Rules of Professional Responsibility, which recently amended and adopted a more liberal approach as to what constitutes the authorized practice of law in a jurisdiction in which an attorney is not a member of the bar. The new Model Rule 5.5 acknowledges the shrinking of our country and our world due to rapid technological advances. Rhode Island, however, has yet to expressly adopt or reject this new ABA rule. ABA Model Rules of Professional Conduct Rule 5.5(c) (2002) states:
 "A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:
 (1) are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter;
 (2) are in or reasonably related to a pending or potential proceeding before a tribunal in this or another jurisdiction, if the lawyer, or a person the lawyer is assisting, is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized;
 (3) are in or reasonably related to a pending or potential arbitration, mediation, or other alternative dispute resolution proceeding in this or another jurisdiction, if the services arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice and are not services for which the forum requires pro hac vice admission; or
 (4) are not within paragraphs (c)(2) or (c)(3) and arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice."
Comment 5 to this Section states:
 "There are occasions in which a lawyer admitted to practice in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction under circumstances that do not create an unreasonable risk to the interests of their clients, the public or the courts. Paragraph (c) identifies four such circumstances. The fact that conduct is not so identified does not imply that the conduct is or is not authorized. With the exception of paragraphs (d)(1) and (d)(2), this Rule does not authorize a lawyer to establish an office or other systematic and continuous presence in this jurisdiction without being admitted to practice generally here."
It should be noted that Rhode Island has not adopted this rule, but there is nothing in its terms which would militate a different result in this case.