# United States Court of Appeals
## For the First Circuit

No. 19-1865

KARA BILLER, as attorney in fact for Joan M. McKenna;
JOAN M. MCKENNA

Plaintiffs, Appellees,

v.

S-H OPCO GREENWICH BAY MANOR, LLC, a/k/a Brookdale Greenwich
Bay; BROOKDALE SENIOR LIVING COMMUNITIES, INC., a/k/a Brookdale
Senior Living, Inc.; BKD HB ACQUISITION SUB, INC.; BKD TWENTY-
ONE MANAGEMENT COMPANY, INC.; S-H TWENTY-ONE OPCO, INC.

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Howard, Chief Judge
Thompson and Barron, Circuit Judges.

Joseph H. Desmond, with whom Morrison Mahoney LLP was on
brief, for appellants.
Anthony R. Leone, II, with whom Leone Law LLC was on brief,
for appellees.

June 5, 2020

**THOMPSON, Circuit Judge.** Joan M. McKenna and her daughter, Kara Biller, brought this lawsuit against McKenna's former assisted living facility, Brookdale Greenwich Bay (we'll call it "Brookdale"),[1] because (they allege) Brookdale agreed to take responsibility for administering McKenna's thyroid medication (methimazole) but dropped the ball. Without her medication, McKenna's thyroid levels spiraled "out of control," she suffered health complications, and she had to be hospitalized. In answer, Brookdale sought to have the case sent to arbitration, fingering an arbitration clause in McKenna's residency agreement. But at Biller and McKenna's urging, the district court denied arbitration and kept the case in court. In its view, the arbitration agreement had expired in 2017, so there was nothing left to enforce.

On appeal, Brookdale argues (as it did below) that the Federal Arbitration Act (FAA) required the district court to send this case to arbitration. According to Brookdale, it was the arbitrator's job to decide when the residency agreement terminated; and even if the rest of the contract did expire, that doesn't mean the arbitration clause lapsed along with it. On this record, we have to agree; given our precedent, we could hardly do otherwise. As such, we conclude that the arbitration agreement

---

[1] Biller and McKenna also sued several related parent, holding, and management companies, including Brookdale Senior Living Communities, Inc., BKD HB Acquisition Sub, Inc., BKD Twenty-One Management Company, Inc., and S-H Twenty-One Opco, Inc.

remains in effect and binds McKenna and Biller to arbitrate their claims.

## I. Background[2]

McKenna moved into Brookdale's Greenwich Bay facility in March 2016.  When she got there, Brookdale gave her a contract (the parties call it the "residency agreement") that set out a payment schedule for the services she'd get during her stay -- though Brookdale (and only Brookdale) reserved the "right to modify fees, rates and charges, [and] amend services provided" without another writing signed by both parties.  The contract said that it would continue indefinitely, but that either party could terminate it "immediately upon written notice in the event of [McKenna's] death or if [she] must be relocated due to [her] health."[3]

Among other provisions, the residency agreement also contained an arbitration clause, which read:

> Any and all claims or controversies arising
> out of, or in any way relating to, this
> Agreement or any of your stays at the

---

[2] This appeal arises from an order on a motion to compel arbitration in connection with a motion to dismiss, so we draw the relevant facts from "the complaint and the parties' submissions to the district court" on the motion.  Bekele v. Lyft, Inc., 918 F.3d 181, 184 (1st Cir. 2019).

[3] There were also other ways to terminate the agreement: McKenna could end it for any reason by 30 days' written notice, and the company could do so for various stated reasons (like if McKenna required care Brookdale couldn't provide, or if her or her visitors' behavior "interfere[d] with the orderly operation of the Community."  Neither of those other termination provisions are at issue here, however.

> Community, excluding any action for involuntary transfer or discharge or eviction, and including disputes regarding interpretation, scope, enforceability, unconscionability, waiver, preemption and/or violability of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties, irrespective of the basis for the duty or the legal theories upon which the claim is asserted, shall be submitted to binding arbitration, as provided below, and shall not be filed in a court of law. **The parties to this Agreement further understand that a judge and/or jury will <u>not</u> decide their case.**

The clause added that any arbitration would be held before an unbiased arbitrator chosen by the parties, and the parties would divide the costs equally.

Presented with this residency agreement, McKenna's daughter and attorney-in-fact Kara Biller signed on her mother's behalf, and McKenna began her stay.

Things didn't go as planned. When McKenna arrived at Brookdale in March 2016, she was under a doctor's order to take methimazole to treat a thyroid condition. At the time, her family members handled her medication; the residency agreement didn't mention it. Some months later, though (in July 2016), Brookdale agreed to take on the task of administering McKenna's meds, including methimazole. But they didn't follow through. According to the plaintiffs, Brookdale didn't give McKenna methimazole for

- 4 -

over a year -- from July 2016 until August 2017.  As a result, her thyroid stopped functioning properly and she suffered health complications.

In July 2017, McKenna was transferred from Brookdale's assisted living unit to the facility's memory care unit, a locked ward for patients with dementia.  When they moved her, Brookdale gave McKenna and Biller an updated residency agreement for Biller to sign.[4]  A month later, McKenna was admitted to a hospital, where she and her family first learned that she had not been taking methimazole.  Shortly after she left the hospital, McKenna moved out of Brookdale for good.

Two years later, she and her daughter sued Brookdale in Rhode Island state court.  Biller and McKenna brought state-law claims for negligence; negligent hiring, training, and supervision; corporate negligence; respondeat superior; and breach

---

[4] At the hearing on the motion to compel arbitration, the record wasn't clear on whether McKenna or Biller ever signed the proposed 2017 agreement; the only evidence was a draft agreement signed by Brookdale, with a blank space for McKenna or her representative.  After the district court denied the motion to compel arbitration, however, Brookdale discovered a fully executed copy of the July 2017 agreement, which contained a similar arbitration provision and both parties' signatures.  Brookdale quickly moved the district court to reconsider its denial of the motion to compel under Rule 59(e) of the Federal Rules of Civil Procedure, but the district court denied the motion.  Brookdale appeals that ruling as well.  But since we conclude that the district court erred in denying the motion to compel arbitration based on the evidence presented at the initial hearing, we need not decide whether it should have granted Brookdale's later request to reconsider that denial.

of contract. These claims were all based on Brookdale's alleged failure to administer methimazole from July 2016 to August 2017.

Brookdale timely removed the suit to federal district court based on diversity jurisdiction and moved to compel arbitration. Brookdale argued that the state-law tort claims and state-law contract claims were unequivocally within the scope of the arbitration agreement.[5] So as Brookdale saw it, the FAA obligated the district court to refer the claims to an arbitrator.

In opposition, Biller and McKenna did not dispute that the arbitration agreement purported to cover their state-law tort and contract claims. Rather, they argued that the arbitration agreement was not "in effect between the parties" for three relevant reasons. First, they argued that the July 2017 "relocation to the new unit due to Ms. McKenna's health terminate[d] the March 2016 residency agreement" that contained the arbitration clause. Second, they argued that the parties formed a new, implied-in-fact "common-law" contract in July 2017 that "supersede[d] the earlier agreements between the parties and . . . d[id] not contain a signed forced arbitration provision." Third, they argued that "the forced arbitration provision that the defendants seek to enforce is unconscionable."

---

[5] Preemptively, Brookdale also argued that to the extent that the plaintiffs disputed the scope or enforceability of the arbitration agreement itself, the parties had clearly delegated such disputes to the arbitrator.

In reply, Brookdale contended that Biller and McKenna had simply raised further disputes as to the scope or enforceability of the arbitration agreement itself. Because the parties had agreed to have an arbitrator decide those threshold disputes, Brookdale argued, the FAA obligated the district court to refer them to an arbitrator.

In the alternative, Brookdale argued that even if the district court were to adjudicate these disputes, it should conclude that the arbitration clause in the March 2016 residency agreement remained in effect. In Brookdale's view, the termination clause in the residency agreement had not been triggered, because McKenna merely "receiv[ed] different services over time at the same facility" throughout her stay; and there was no superseding agreement, because the March 2016 residency agreement contemplated additional services and fees. Therefore, Brookdale argued, the 2016 agreement was still in effect and compelled arbitration.

After a hearing, the district court denied the motion to compel arbitration from the bench. It concluded that "there is no signed agreement containing an arbitration clause which would otherwise be enforceable by this Court," because "[t]he March '16 agreement terminated when Ms. McKenna was moved to a memory unit from her assisted living unit where she had been before." The district court therefore refused to send "any question to an arbiter." Brookdale timely appealed. See 9 U.S.C. § 16(a)(1)(B).

- 7 -

## II. The FAA

The Federal Arbitration Act provides: "A written provision in . . . a contract . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Designed to counter "widespread judicial hostility to arbitration," Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 232 (2013), the Act makes arbitration "a matter of contract, and courts must enforce arbitration contracts according to their terms," Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).  "We review both the interpretation of arbitration agreements and orders compelling arbitration de novo." S. Bay Bos. Mgmt. v. Unite Here, Local 26, 587 F.3d 35, 42 (1st Cir. 2009).

"A party seeking to compel arbitration under the FAA must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'"  Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)).  If the movant makes that showing, the court has to send the dispute to arbitration "unless the party resisting arbitration specifically challenges the enforceability of the arbitration

- 8 -

clause itself . . . or claims that the agreement to arbitrate was 'never concluded.'"  Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 301 (2010) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 n.1 (2006) (cleaned up)).  Those issues, which implicate "[w]hether or not a dispute is arbitrable," are typically for the court to decide.  Dialysis, 638 F.3d at 375.

### III. Our Take

Here, the parties dispute when the contract terminated. Biller and McKenna assume that if (as they urge) it expired in July 2017, the arbitration clause no longer binds the parties, and the district court was right to keep this case for itself.  As below, Brookdale disagrees.  In Brookdale's view, it was the arbitrator's job -- not the district court's -- to decide when the contract terminated.  In any event, says Brookdale, Biller/McKenna's argument rests on a false premise:  that the arbitration agreement expired when the residency agreement did. In fact, the parties' obligation to arbitrate claims about the residency agreement and McKenna's stay at Brookdale survives to this day, even if the rest of the residency agreement expired.  We agree with Brookdale.

To explain why, we start with a gateway issue -- whether we (rather than the arbitrator) should interpret the arbitration clause in the first place to decide which disputes it covers (spoiler alert:  we must).  Once that's out of the way, we'll take

- 9 -

Biller/McKenna's "termination" argument on its own terms.  In doing so, we conclude that the plain text of the arbitration clause makes it the arbitrator's job (not the district court's) to interpret the residency agreement and decide when it terminated.  In any event, however, even if the residency agreement expired in 2017, the arbitration agreement would still compel the parties to arbitrate their disputes "arising out of" or "relating to" the residency agreement or "any of [McKenna's] stays" at Brookdale's facility, including Biller and McKenna's claims in this case.  We save Biller and McKenna's last two contentions -- that the parties overwrote the 2016 arbitration provision with a new agreement, and that the provision was unconscionable -- for last.

### A. Gateway Issue: Who Picks the Decider?

First things first.  As a threshold matter, Brookdale argues that the parties agreed to have an arbitrator interpret the arbitration clause itself and (therefore) to decide all disputes about arbitrability.  If Brookdale is right, then the arbitrator must resolve even the gateway question of who (a court or the arbitrator) should decide the parties' core disputes, including their fight over contract termination.  And as part of that threshold question, the arbitrator would have to decide (as we do later) whether the arbitration clause is enforceable at all.

But we see no such agreement.  It is true that "parties may agree to have an arbitrator decide not only the merits of a

particular dispute but also '"gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" Schein, 139 S. Ct. at 529 (quoting Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68-69 (2010)). They must do so, however, by "clear and unmistakable" evidence. Id. at 530 (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). This standard is "demanding." Patton v. Johnson, 915 F.3d 827, 835 (1st Cir. 2019). And here's the kicker: it "requires more than simply saying that the arbitrator determines the meaning of any disputed contractual terms." Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 102 (4th Cir. 2012) (reaffirming that an arbitration clause "committ[ing] all interpretive disputes 'relating to' or 'arising out of' the agreement" does not pass the "clear and unmistakable" test) (quoting Carson v. Giant Food, Inc., 175 F.3d 325, 329, 330 (4th Cir. 1999)); accord Commc'n Workers of Am. v. Avaya, Inc., 693 F.3d 1295, 1303 (10th Cir. 2012). So, for example, in AT & T Technologies, Inc. v. Communications Workers of America, the Court held that even though the arbitration clause committed "any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder" to arbitration, it was still "for the court, not the arbitrator, to

- 11 -

decide in the first instance whether the dispute was to be resolved through arbitration."   475 U.S. 643, 650-51 (1986).

Likewise, Brookdale's arbitration clause does not supply clear and unmistakable evidence that the parties agreed to have an arbitrator decide whether to arbitrate their disputes, because the clause could reasonably be interpreted to cover only controversies over the underlying residency agreement and the circumstances of McKenna's stay at Brookdale but not disputes over the arbitration provision itself.  To be sure, the clause does cover "controversies . . . relating to[] this Agreement," and "disputes regarding interpretation, scope, enforceability, unconscionability . . . and/or violability of this Agreement."  But the phrase "this Agreement" could reasonably (and likely does) refer only to the underlying residency agreement; indeed, that is how the parties use the phrase throughout the rest of the contract.[6]  We have

---

[6] See Appellant's Add. at 26 ("This Agreement ('Agreement') dated March 18, 2016 is made by and between S-H OpCo Greenwich Bay Manor, LLC . . . and Joan McKenna."); id. ("We will provide you with the following Basic Services, which are included in the Basic Service Rate, subject to the terms of this Agreement"); id. at 27 ("The available Select Services and Therapeutic Services as well as the associated prices are found on Exhibit X and Exhibit Y to this Agreement"); id. at 28 ("For your safety and comfort, our associates must be permitted to enter your Suite to provide services under the terms of this Agreement."); id. at 30 ("You agree that we may use and disclose Resident Data . . . to provide to you services covered by this Agreement."); id. ("Unless prohibited by law, you agree we may offset such refunds by any amount due under the terms of this Agreement."); id. at 31 ("This Agreement begins on the date set forth above and continues until terminated as provided below."); id. 32 ("Either party may

demanded more specific language before concluding that the parties delegated all questions of arbitrability to the arbitrator. See Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 10–12 (1st Cir. 2009) (finding the arbitration agreement delegated those threshold questions to the arbitrator because it incorporated rules authorizing the arbitrator to determine the "existence, scope or validity of the arbitration agreement"; but noting that "where the parties merely agree that the validity of the *contract* should be subject to arbitration, this does not commit to the arbitrator a dispute about whether the arbitration *clause* is valid"). A "typical, broad arbitration clause" like this one doesn't pass the test. Carson, 175 F.3d at 330 (quoting Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc., 984 F.2d 113, 117 (4th Cir. 1993)).[7]

---

terminate this Agreement immediately upon written notice in the event of your death or if you must be relocated due to your health."); id. at 36 ("You understand and agree to assume the risks inherent in this Agreement."); id. ("This Agreement is not assignable without our prior written consent.").

[7] We realize that the Second Circuit has held that "[b]road language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability[.]" Metro. Life Ins. Co. v. Bucsek, 919 F.3d 184, 191 (2d Cir. 2019). But it is far from obvious that a typical commitment to arbitrate matters "arising out of or relating to" the parties' underlying contractual relationship evinces a "clear and unmistakable" intent to arbitrate *all* aspects of *all* disputes between the parties, *including* the "arcane" question of "the scope of [the arbitrator's] own powers." First Options, 514 U.S. at 945. Holding that boilerplate to be sufficient would threaten to flip the presumption in AT & T Technologies and First Options on its head. In any event, Brookdale does not urge us to apply the Second Circuit's test. In fact, it does not identify what language

- 13 -

## B. Who Decides When the Contract Terminated?

Since the parties didn't delegate the threshold "who decides" question to the arbitrator, it's up to us to interpret the arbitration clause and determine whether it gives the arbitrator the duty to decide when the residency agreement ended. We conclude that it does. The arbitration clause gives him or her the power to decide all "disputes regarding interpretation . . . of th[e] Agreement" (meaning the residency agreement). And unfortunately for Biller/McKenna, that describes their dispute over the contract's "termination" to a T. On the one hand, the duo argue that the contract expired (and the arbitration clause with it) by its own terms: the clause providing that either party could terminate the residency agreement if McKenna had to "be relocated due to [her] health." In Biller/McKenna's view, the parties triggered this clause when they transferred McKenna from the assisted living unit to the memory care unit. Not so, says Brookdale. The plaintiffs keep using that word ("relocate"), but

in the arbitration clause clearly tasks arbitrator to decide questions of arbitrability. Instead, it argues flatly that <u>Schein</u> held that "all disputes over the applicability and enforcement of arbitration agreements must be delegated to an arbitrator." Appellant's Br. at 13–14. But of course, <u>Schein</u> did not overrule (in fact, it reaffirmed) the well-established rule that courts must decide arbitrability unless the parties "clear[ly] and unmistakabl[y]" delegated that threshold question to the arbitrator. 139 S. Ct. at 530–31 (quoting <u>First Options</u>, 514 U.S. at 944, and "express[ing] no view about whether the contract at issue . . . in fact delegated the arbitrability question to the arbitrator").

it does not mean what they think it means.  Rather (Brookdale elaborates), a resident is not "relocated due to [her] health" if she does not "leave the facility," and McKenna just "receiv[ed] different services over time at the same facility" throughout her stay.  To figure out who's right, someone needs to decide what the word "relocate" means in the residency agreement.  As the arbitration clause makes clear, interpretive disputes like that must go to the arbitrator.

In fact, our precedent compels that conclusion.  Most recently, in Unite Here Local 217 v. Sage Hospitality Resources, an employer made a similar argument to the one Biller and McKenna advance here:  that a labor agreement had terminated before the dispute arose and the union invoked arbitration.  642 F.3d 255, 258-59 (1st Cir. 2011).  The parties there had agreed to arbitrate "any dispute over the interpretation or application" of the labor agreement, which had a duration clause that said the agreement would be "in full force and effect . . . until thirty months from the full public opening" of a hotel.  Id. at 257.  Just as McKenna/Biller/Brookdale dispute the meaning of the word "relocate," the parties in Unite Here disputed the date of the hotel's "full public opening."  Id. at 257-58. We held that their "dispute over the meaning of language in the duration clause" of the underlying agreement was "a classic issue of contract

- 15 -

construction and one the parties clearly contemplated would be resolved by an arbitrator."  Id. at 262.  So it is here.

In defense of the order below, Biller and McKenna argue that it was district court's job to decide when the contract terminated.  That *must* be so, they say, because before a court can send any dispute to the arbitrator, the court has to make sure "there exists a written agreement to arbitrate" that dispute. Cullinane v. Uber Techs., Inc., 893 F.3d 53, 60 (1st Cir. 2018) (quoting Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008)).  The FAA only "place[s] arbitration agreements upon the same footing as other contracts"; it "does not require parties to arbitrate when they have not agreed to do so."  Id. (internal quotation marks omitted).  So, Biller/McKenna explain (correctly), the question of whether the arbitration clause terminated and no longer binds the parties is an issue of arbitrability which (when properly presented and not clearly and distinctly delegated to the arbitrator), the court must decide.  See Granite Rock, 561 U.S. at 299–300; Dialysis, 638 F.3d at 375.  So far so good.  But here's where they go off track.  According to Biller and McKenna, if the *residency agreement* terminated, then the arbitration clause died with it; there no longer "exists a written agreement to arbitrate," Cullinane, 893 F.3d at 60; and the court can't compel arbitration. Therefore (conclude Biller and McKenna), before the court could send any dispute between the parties to the arbitrator, it had to

decide whether the contract (and therefore the arbitration clause) remains in effect. But that's not correct.

In fact, we faced and rejected the same argument in Unite Here. See 642 F.3d at 258-60. There, the hotel (like Biller and McKenna) argued that "whether [the underlying] Agreement was in effect at the time it was invoked by the Union" was a question of "arbitrability" for the court to decide. Id. But there, as here (with the exception of Biller/McKenna's unconscionability challenge, which we'll discuss later), "the parties d[id] not contest that the [arbitration] [a]greement was valid, that they were subject to its requirements, and that the substantive scope of the arbitration clause" -- covering disputes over how to interpret the underlying contract -- was "clear." Id. at 262. We explained that in such cases, the question of when the underlying contract terminated "concerns neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties"; and as such, it is "not a substantive question of arbitrability but a 'matter of contract interpretation . . . for the arbitrator, not the courts, to decide.'" Id. (quoting Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 453 (2003) (plurality opinion)); see also Int'l Bhd. of Elec. Workers, Local 1228, AFL-CIO v. Freedom WLNE-TV, Inc., 760 F.2d 8, 10 (1st Cir. 1985) ("Where, however, the determination of whether a contract is still in effect depends solely upon construction of the collective

bargaining agreement, the issue of contract termination may appropriately be decided by the arbitrator.").

But how can that be? -- demand Biller and McKenna.  If the contract terminated, as they say it did, then the arbitration clause must die with it, and the arbitrator would lack the power to decide the termination dispute in the first place, wouldn't he?  But that's where they go wrong; in fact, even if the rest of the *residency contract* terminated, that would not mean that *arbitration agreement* lapsed with it.  To see why, we review two basic principles of arbitration law that help explain the outcomes in Unite Here, Freedom WLNE-TV, and (ultimately) this case.

## C. Post-expiration Arbitration

First off, unless the parties provided otherwise, an arbitration provision "is severable from the remainder of the contract."  Buckeye, 546 U.S. at 445 (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 402 (1967) (holding that "except where the parties otherwise intend," "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded")).  To avoid arbitration, then, a party must ordinarily make a targeted, "independent challenge" to the arbitration clause itself.  Large v. Conseco Fin. Servicing Corp., 292 F.3d 49, 53 (1st Cir. 2002) (quoting Unionmutual Stock Life Ins. Co. v. Beneficial Life Ins. Co., 774 F.2d 524, 529 (1st Cir. 1985)).  When the arbitration-resister "specifically challenges

the enforceability of the arbitration clause itself" (again, unless another provision clearly delegated the issue to the arbitrator) the court must decide that challenge before it can compel arbitration. Granite Rock, 561 U.S. at 301. So, a properly-developed argument that the arbitration clause lapsed -- for example, because the arbitration agreement provides that it will expire on some condition, or because the parties later agreed to submit their disputes to a court -- would be the court's to decide. On the other hand, when someone argues (as Biller/McKenna do in their termination-clause-based challenge) that a broad arbitration clause is invalid or unenforceable only "on a ground that directly affects the entire agreement" that challenge is ordinarily for the arbitrator to decide. Rent-A-Ctr., 561 U.S. at 70-71 (quoting Buckeye, 546 U.S. at 444) ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate"; "the basis of challenge [must] be directed specifically to the agreement to arbitrate before the court will intervene.").[8]

Biller and McKenna acknowledge that this severability principle governs their unconscionability challenge. But in this

---

[8] As we noted above, there is an important exception: when the challenger argues that no "agreement between the parties 'was ever concluded,'" the court must decide that challenge. Rent-A-Ctr., 561 U.S. at 70 n.2 (quoting Buckeye, 546 U.S. at 444 n.1).

circuit, "[t]he basis of the underlying challenge to the contract does not alter the severability principle." Unionmutual, 774 F.2d at 529. And we've applied it to compel arbitration in other cases where one party asserted the underlying contract terminated. In Large and Unionmutual, the parties challenging arbitration claimed that they had rescinded the underlying contract, and the arbitration agreement with it, based on frustration of purpose, Unionmutual, 774 F.2d at 529, and their rights under state statute (claiming that the bank broke the statute's disclosure rules), Large, 292 F.3d at 53. In both cases, we held that the arbitration provisions at issue still compelled the arbitrator to decide if and when the underlying contract was properly rescinded. See id. Biller and McKenna's challenge -- that the arbitration clause no longer binds the parties because the rest of the contract terminated -- is not meaningfully different. Even if the rest of the parties' contractual rights and obligations ended (whether based on a general termination clause or a rightful rescission) that would not mean their duties to arbitrate their contract-related disputes ended, too.

Second -- although it didn't come up in Unionmutual or Large -- when deciding (when we must) whether the parties' arbitration duties have expired, we *presume* that the arbitration clause (independent as it is) survives the underlying contract. In theory, this presumption reflects commercial custom: When two

- 20 -

parties commit to arbitrate disputes arising under a contract, they ordinarily mean to bind each other to arbitrate such disputes even if the grievant doesn't complain until after the contract expires. See Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B., 501 U.S. 190, 205, 208 & n.3 (1991) ("We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement." (citing Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union, 430 U.S. 243, 255 (1977))). Taking our cues from Litton and Nolde Bros., we have compelled parties to a broad arbitration agreement to arbitrate post-expiration disputes that have their "real source" in the underlying contract unless "postexpiration arbitration of the issue was negated expressly or by clear implication." S. Bay Bos. Mgmt., 587 F.3d at 43 (quoting United Parcel Serv. v. Unión De Tronquistas de Puerto Rico, Local 901, 426 F.3d 470, 473 (1st Cir. 2005)).

Taken together, these two related principles help explain our decisions in Unite Here, Freedom WLNE-TV, Large, and Unionmutual -- and they compel Biller/McKenna to arbitrate their claims against Brookdale. As in those cases, Biller and McKenna argue that the arbitration agreement expired only on the grounds that the contract containing the arbitration agreement terminated. But as we've explained, to successfully argue that an arbitration

agreement terminated and no longer governs any claim, Biller and McKenna had to mount an "independent" challenge to the arbitration agreement itself, Large, 292 F.3d at 55 (quoting Unionmutual, 774 F.2d at 529) -- for example, by identifying evidence that the parties intended not only the residency agreement but also their *arbitration obligations* to lapse when McKenna relocated (or at some other time before Brookdale sought to invoke arbitration). See Litton, 501 U.S. at 204; Nolde Bros., 430 U.S. at 255; S. Bay Bos. Mgmt., 587 F.3d at 43.  They didn't meet that burden here.[9]

## IV. Plaintiffs' Other Arguments

Biller and McKenna present two back-up reasons to affirm the denial of the motion to compel arbitration.  First, they urge that the parties entered a brand-new agreement in July 2017, when McKenna moved, and that this new deal superseded the original 2016 residency agreement and extinguished its arbitration clause. Second, they claim that the arbitration agreement was unconscionable and unenforceable.  No doubt, we "can affirm on any

---

[9] Biller and McKenna argue that Brookdale forfeited its argument that the arbitration agreement survived the termination of the contract by not raising the argument in its motion to compel arbitration below.  However, once Brookdale pointed to a valid agreement to arbitrate that covered their interpretive dispute, it was Biller and McKenna's burden to make "an independent challenge" to the arbitration clause itself to explain why it was no longer enforceable.  Large, 292 F.3d at 55; see Rent-A-Ctr., 561 U.S. at 72-73; see also Unite Here, 642 F.3d at 262 (explaining that when the arbitration agreement covers disputes over the interpretation of the underlying contract, the issue of when the contract terminated is presumed to be for the arbitrator).

- 22 -

ground appearing in the record -- including one that the [district] judge did not rely on." Rivera-Colón v. AT&T Mobility Puerto Rico, Inc., 913 F.3d 200, 207 (1st Cir. 2019) (quoting Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016)). But neither argument convinces us to do so.

## A. Replacement Contract

Biller and McKenna first argue that we should affirm because when the parties had McKenna moved to the memory care unit and raised her monthly fee (from $4,224 to $5,007) in July 2017, they impliedly abandoned the March 2016 residency agreement (along with its arbitration clause) by forming a new, unwritten contract that wiped out the old one. See Dasher v. RBC Bank (USA), 745 F.3d 1111, 1121 (11th Cir. 2014) ("[C]ontracting parties are free to revoke an earlier agreement to arbitrate by executing a subsequent agreement the terms of which plainly preclude arbitration." (quoting Applied Energetics, Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522, 525 (2d Cir. 2011)). Since this replacement contract had no arbitration provision (the theory goes), the district court was right keep this case for itself.

Unlike an argument that the main-event contract terminated by its terms, a claim that two parties later agreed to extinguish their arbitration pledge (specifically) is for the courts to decide. See id.; accord Jaludi v. Citigroup, 933 F.3d 246, 255 (3d Cir. 2019) (explaining that "the question of whether

- 23 -

a later agreement supersedes a prior arbitration agreement is tantamount to whether there is [still] an agreement to arbitrate" in the first place); Applied Energetics, 645 F.3d at 525-26. In Dasher (on which Biller and McKenna mainly rely), the Eleventh Circuit held that this is true even if the challenger alleges (as Biller and McKenna do) that the parties agreed to replace both the underlying contract and the arbitration clause in one fell swoop -- with a new deal that excludes arbitration. See 745 F.3d at 1121-23 (holding that when a new agreement that "entirely supersed[es]" the old "is silent on arbitration, arbitration cannot be compelled even if [the] prior agreement contained an arbitration clause"). Brookdale doesn't quibble with Dasher's approach, and we see no reason to, either. Because in the end, Biller and McKenna give us no reason to think that the parties ever agreed to replace the 2016 residency agreement with an "entirely superseding" contract that snuffed out their arbitration duties. Id.

Under Rhode Island law (which we're urged to apply), a "substituted contract" claim like theirs rests on a "factual determination" that two parties "mutual[ly] agree[d]" to "extinguish" their "rights and obligations" under an earlier contract and replace them with new ones. Weaver v. Am. Power Conversion Corp., 863 A.2d 193, 198 (R.I. 2004) (quoting Salo Landscape & Const. Co. v. Liberty Elec. Co., 376 A.2d 1379, 1382

- 24 -

(R.I. 1977)). Generally, however, when a later bargain between the same parties "completely cover[s] the same subject-matter . . . as an earlier agreement" but "contain[s] terms inconsistent with the former contract, so that the two cannot stand together," it replaces the "earlier contract and becomes the only agreement of the parties on the subject." Carlsten v. The Widecom Grp., Inc., C.A. No. 97-1425, 2003 WL 21688263, at *8 (R.I. Super. July 1, 2003)(quoting De Blois v. Boylston & Tremont Corp., 183 N.E. 823, 827 (1933)); see also Jaludi, 933 F.3d at 256 (applying the same rule "[u]nder Pennsylvania law": that "the later of two agreements between the same parties as to the same subject matter generally supersedes the prior agreement"); Applied Energetics, 645 F.3d at 526 (same under New York law).

Biller and McKenna do not contend that the parties entered a new *written* agreement, or even an oral one. But they do suggest that Brookdale's actions -- moving McKenna and raising her monthly fee -- and Biller/McKenna's choice to go along with them (agreeing to the move and paying a higher fee) reflected what's called an "implied in fact" contract: i.e., an agreement gleaned from the "parties' conduct, actions, and correspondence" rather than their words. Cote v. Aiello, 148 A.3d 537, 545 (R.I. 2016) (quoting Marshall Contractors, Inc. v. Brown Univ., 692 A.2d 665, 669 (R.I. 1997)); see also Bailey v. West, 249 A.2d 414, 416 (R.I. 1969) (explaining that "essential elements of contracts 'implied

- 25 -

in fact' are mutual agreement[ ] and intent to promise, but [where] the agreement and the promise have not been made in words and are implied from the facts").

In the end, though, this "new contract" theory doesn't save Biller and McKenna's claims from arbitration. They offer no evidence that the parties did anything to "extinguish" the 2016 arbitration agreement, Weaver, 863 A.2d at 198, or strike a new deal that "completely cover[ed] the same subject-matter" and was "inconsistent with" that agreement, Carlsten, 2003 WL 21688263, at *8. Unlike in Dasher, the parties did not sign a new arbitration-clause-free contract that expressed a "clear and definite" intent to "entirely supersede" the 2016 residency agreement including the arbitration clause. 745 F.3d at 1118–20. Brookdale does not dispute that the changes to McKenna's fees and services reflect modifications to the underlying contract. See id. at 1120 (distinguishing cases in which the parties merely "amend[ed] portions of the prior [substantive] agreement" but left the arbitration clause alone).[10] But the arbitration clause itself

---

[10] Brookdale adds that the 2016 residency agreement reserved for Brookdale the "right to modify fees, rates and charges, [and] amend services provided" without a new written contract. And in their response, Biller and McKenna made no attempt to address that point or explain why the changes to McKenna's fees and services were anything other than "modific[ations]" or "amend[ments]" contemplated under the original agreement that left the arbitration provision intact. That language in the original contract may well provide another ground for concluding that the changes to McKenna's fees and services did not entirely supersede

- 26 -

indicates that it would apply even if the terms of the underlying contract changed: it covered (remember) any dispute "arising out of, or in any way relating to" not just the 2016 agreement, but also "*any* of [McKenna's] stays at the Community" (emphasis added)). And the chief evidence on which Biller and McKenna rely -- a draft residency agreement dated to July 2017 -- was unexecuted by Biller or McKenna, and in any event, it contained an identical arbitration agreement. So that draft new agreement can't show the parties meant to end their clear commitment to arbitrate disputes related to the 2016 agreement or McKenna's stays at Brookdale, either. Rather, the evidence points to only one conclusion: that the 2016 arbitration agreement remains in effect.

## B. Unconscionability

Biller and McKenna finally argue that we should affirm because the district court could have concluded that the arbitration agreement was unconscionable under Rhode Island law. This dispute is also for the courts to resolve, because under the FAA, an arbitration agreement may still "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" Rent-A-Ctr., 561 U.S. at 68 (quoting Dr.'s Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)). Where a

---

it. But since (as we've already explained) the parties left it for the arbitrator to interpret terms (like "modify" and "amend") in the original contract, we don't rely on those provisions here.

party challenges the validity of an arbitration agreement specifically, absent a clear intent to commit the dispute to the arbitrator, the court has to resolve that dispute. Granite Rock, 561 U.S. at 299-300.[11] This validity assessment entails "consideration of the enforceability of the agreement and if it is void or voidable" under state law. Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 81 (1st Cir. 2018).

Here, Biller and McKenna have not shown the arbitration agreement in the March 2016 residency agreement is unconscionable. As we've read it, Rhode Island law requires the party opposing arbitration to prove both procedural and substantive unconscionability: procedurally, that the party had no "meaningful choice" but to sign the contract, and substantively, that "the challenged contract terms are unreasonably favorable to the other party." Britto v. Prospect Chartercare SJHSRI, LLC, 909 F.3d 506, 515 (1st Cir. 2018) (quoting E.H. Ashley & Co. v. Wells Fargo Alarm Servs., 907 F.2d 1274, 1278 (1st Cir. 1990)). The

---

[11] Of course, "the validity of an arbitration clause is itself a matter for the arbitrator where the agreement so provides." Awuah, 554 F.3d at 11. (Although, even then, we still must consider any challenge to "the precise agreement to arbitrate at issue," namely the agreement providing for arbitration of the validity of the arbitration clause. Rent-A-Ctr. 561, U.S. at 71). But as we have discussed, there is no clear and unmistakable evidence that the parties agreed to delegate disputes over the enforceability or unconscionability of the arbitration agreement itself.

party challenging an arbitration agreement as unconscionable bears the burden to show both prongs are met. See id.

Biller and McKenna argue that the arbitration agreement was procedurally unconscionable because (among other things) McKenna had no meaningful opportunity to negotiate its terms; Brookdale foisted the agreement on her only after she'd moved in with all her belongings. But even if the agreement was *procedurally* unconscionable (which we don't decide), Biller/McKenna haven't produced evidence that could reasonably show the arbitration agreement is unconscionable in substance.

When it comes to substantive unconscionability, Rhode Island law sets a daunting standard: the "inequality of the bargain [must be] so manifest as to shock the judgment of a person of good sense," and the "terms [must be] so unreasonable that 'no man in his senses and not under delusion, would make on the one hand, and as no honest and fair man would accept on the other.'" Grady v. Grady, 504 A.2d 444, 446-47 (R.I. 1986) (quoting Hume v. United States, 132 U.S. 406, 411 (1889)). On its face, Brookdale's arbitration agreement doesn't seem to flunk that test: as Brookdale points out, it says the arbitration will take place in Rhode Island (in "the county in which the Community is located"), the arbitrator will be impartial and apply the Rhode Island Rules of Civil Procedure and Rhode Island law, and the parties will choose an arbitrator together and split the costs evenly.

In response, Biller and McKenna take a scattershot approach.  They list twelve one-sentence challenges to support their position that the arbitration agreement is unconscionable. We treat the overwhelming majority of them as waived for lack of development.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  But two arguments call for further discussion.

First, Biller and McKenna argue that the arbitration agreement is substantively unconscionable because "the parties share the cost of the arbitrator."  The Rhode Island high court has not spoken directly to the unconscionability of arbitration-cost-sharing.  But, addressing an analogous challenge that an arbitration agreement prevented the "effective vindication" of federal statutory rights, the Supreme Court held that "where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs."  Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 90–92 (2000).  Taking their cues from Green Tree, most state courts, in their tests for substantive unconscionability, also require the party alleging that arbitration would be too expensive to produce evidence of the financial burden the arbitration is likely to

- 30 -

impose.[12]   For example, we recently noted that in neighboring Massachusetts, "an arbitration-fee-splitting arrangement is not substantively unconscionable when the arbitration fees a plaintiff would owe amount to less than the damages the plaintiff claims." Bekele v. Lyft, Inc., 918 F.3d 181, 188 (1st Cir. 2019).

But Biller and McKenna point to no evidence of their financial condition or of the potential costs of arbitrating their dispute with Brookdale.  Nor do they give us any reason to think that the courts of Rhode Island -- which gives arbitration a "favored status," Pepin v. Am. Universal Ins. Co., 540 A.2d 21, 22 (R.I. 1988) (citing R.I. Gen. Laws § 10-3-2) -- would adopt a rule that fee splitting is always unconscionable in cases like this one.[13]  With so little to go on, we can't conclude the fee-splitting

---

[12] See, e.g., Larsen v. Citibank FSB, 871 F.3d 1295, 1316 (11th Cir. 2017) ("[U]nder Washington law, the party challenging a fee-splitting provision must provide specific information about the arbitration fees it would be required to pay and describe why those fees would be prohibitive."); Tompkins v. 23andMe, Inc., 840 F.3d 1016, 1026 (9th Cir. 2016) (describing California law as "adopt[ing] 'an ability-to-pay approach' to arbitration fees in the consumer context, requiring a 'case-by-case determination of affordability' for consumers, and a rejection of the . . . categorical approach"); Kai Peng v. Uber Techs., Inc., 237 F. Supp. 3d 36, 57 (E.D.N.Y. 2017) (noting correctly that "[c]ourts applying New York law have refused to find that fee-splitting provisions in arbitration agreements are unenforceable where plaintiffs have not affirmatively demonstrated that the fee-splitting provisions would preclude them from pursuing their rights in the arbitral forum" (citing Brady v. Williams Capital Grp., L.P., 14 N.Y.3d 459, 467 (2010)).

[13] In Brookdale Senior Living Communities v. Allen, the United States District Court for the District of Oregon held that a

provision makes the arbitration agreement here substantively unconscionable under Rhode Island law.

Second, Biller and McKenna argue that "the requirement of confidentiality perpetuates the bad conduct Brookdale engaged in here and places other people at risk of similar injuries."[14]  In

---

similar fee-splitting provision in one of Brookdale's arbitration agreements, along with other one-sided provisions, rendered the agreement unconscionable.  No. 15-1400-CL, slip. op. at *11 (D. Or. Dec. 1, 2015).  In that case, though, the challenger submitted an affidavit estimating likely arbitration fees.  Id.  The court nonetheless held that "such a showing [was] not necessary . . . where it is undisputed that the [consumer] would have to pay all or part of the arbitrator's fees," citing decisions in the Ninth and D.C. Circuits holding that cost-sharing provisions are unconscionable as applied to statutory claims because they "impose[ ] on some consumers costs greater than those a complainant would bear if he or she would file the same complaint in court." Id. (citing Ting v. AT & T, 319 F.3d 1126, 1151 (9th Cir. 2003); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1485 (D.C. Cir. 1997)).  After Green Tree, however, the D.C. Circuit has declined to extend Cole to common-law claims like Biller/McKenna's, Brown v. Wheat First Sec., Inc., 257 F.3d 821, 825–26 (D.C. Cir. 2001), and the Ninth Circuit (based on subsequent state law developments) has limited the rule in Ting to the employment context, see Tompkins, 840 F.3d at 1026.  Thus, we are not persuaded that the Rhode Island courts would adopt such a per se rule.  So we conclude that Biller and McKenna have not shown that Brookdale's arbitration clause is substantively unconscionable for fee-splitting reasons.

[14] The confidentiality provision stated:

The arbitration proceeding shall remain confidential in all respects, including the Demand for Arbitration, all arbitration filings, deposition transcripts, documents produced or obtained in discovery, or other material provided by and exchanged between the parties and the arbitrator's findings of fact and conclusions of law . . . .  Further, the parties to the arbitration also agree not to discuss the amount of the arbitration award or any settlement, the names of the parties, or

a similar vein, the Ninth Circuit (applying California law) has held that a contractual provision requiring "all arbitration" to "remain confidential" was unconscionable as applied to a putative class of millions of consumers because it unreasonably favored corporate repeat players like (potentially) Brookdale, who could learn from the results of prior arbitrations, over first-timers who (due to the gag provision) would lack access to information about past arbitrations against the company involving similar issues. See Ting, 319 F.3d at 1151–52; see also Pokorny v. Quixtar, Inc., 601 F.3d 987, 1002 (9th Cir. 2010) (reasoning that an agreement not to discuss the plaintiffs' claims with other employees could also handicap their "ability to investigate their claims and engage in meaningful discovery"); Larsen, 871 F.3d at 1319 (invalidating a similar agreement under Washington law because the company's "informational advantage" could "discourag[e] consumers from pursuing valid claims").

More recently, however, other courts have recognized that "[c]onfidentiality can be desirable to customers in some circumstances," holding that similar mums-the-word provisions don't always make the arbitration agreement unconscionable. Iberia Credit Bureau, Inc., v. Cingular Wireless LLC, 379 F.3d

name/location of the Community except as required by law.

- 33 -

159, 175 (5th Cir. 2004) (applying Louisiana law and citing Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 8 n.4 (1st Cir. 1999), where we noted in dicta that both sides of a dispute may "prefer arbitration because of the confidentiality and finality that comes with arbitration"); Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1378-79 (11th Cir. 2005) (applying Georgia law). The Ninth Circuit has since joined this club, applying later developments in California law to uphold confidentiality provisions similar to Brookdale's and limiting Ting (if it survives at all) to cases involving thousands or millions of consumers. See Poublon v. C.H. Robinson Co., 846 F.3d 1251, 1265–67 & n.4 (9th Cir. 2017) (citing Kilgore v. KeyBank, Nat'l Ass'n, 718 F.3d 1052, 1059 n.9 (9th Cir. 2013) (en banc)); accord Machado v. System4 LLC, 28 N.E.3d 401, 415 (Mass. 2015) (upholding confidentiality requirement in a contract that affected only "a relatively small and known quantity" of workers).!

Against this background, Biller and McKenna's uphill attack on the confidentiality provision can't succeed. They don't address any facts (like the number of residents subject to the agreement) that bear on the strength of Brookdale's repeat-player advantage; they don't argue that the confidentiality provision is broad enough to stymie their evidence-gathering efforts; and, most importantly, they don't marshal any Rhode Island caselaw suggesting the Ocean State courts would hold such provisions

- 34 -

unconscionable despite the state's policy favoring arbitration as a means of dispute resolution.  See Pepin, 540 A.2d at 22.  As such, they haven't established that the arbitration agreement here signed is unenforceable.

## V. Wrap up

For these reasons, the district court's order denying arbitration is reversed, each side to bear its own costs.  We remand to the district court with instructions to compel arbitration over all disputes remaining in this case.