# United States Court of Appeals
## For the First Circuit

No. 20-2170

MICHAEL MCKENZIE, individually and d/b/a American Image Art,

Plaintiff, Appellant,

v.

JAMES W. BRANNAN, as personal representative of the Estate of
Robert Indiana,

Defendant, Appellee,

AARON M. FREY, in his official capacity as Attorney General of
the State of Maine,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., <u>U.S. District Judge</u>]

Before

Thompson, Hawkins,[*] and Barron,
<u>Circuit Judges</u>.

<u>John J.E. Markham, II</u>, with whom <u>Bridget A. Zerner</u> and
<u>Markham & Read</u> were on brief, for appellant.
<u>Seth W. Brewster</u>, with whom <u>Alfred J. Falzone, III</u> and
<u>Eaton Peabody</u> were on brief, for appellee.

---

[*] Of the Ninth Circuit, sitting by designation.

November 22, 2021

**THOMPSON, Circuit Judge**. Famous artwork, business relationships, and contract law collide in today's case. The matter lands here amidst a tangle of litigation involving an art publisher, the personal representative of the estate of a famous American artist, and the agreement(s) between them. The publisher says the parties' original contract, which included an arbitration provision, was terminated and supplanted by a superseding contract, which did not contain an agreement to arbitrate. According to the publisher, the arbitrability of the parties' dispute about this newer contract's enforceability and impact on the earlier agreement to arbitrate should be decided by the court, not arbitrators. So, in the publisher's telling, the district court erred when, in accordance with the original agreement's arbitration clause, it sidestepped the potential effect of the newer contract and concluded that the gateway question of arbitrability was for the arbitrators. The estate, of course, says the district court got its analysis just right.

After careful review of this nuanced matter, we vacate the grant of the motion to compel arbitration, the dismissal of the request for a preliminary injunction, and the dismissal of the complaint, and we remand for further proceedings.

## I.  BACKGROUND[1]

### A.  Robert Indiana, Michael McKenzie, and the 2008 Agreement

During the American Pop Art Movement of the 1960s, artist Robert Indiana ("Indiana") conceived of an image of the word "love."  His distinctive rendering of the word -- colorful, all-caps letters arranged in a square, with the L and a tilted O sitting atop the V and E -- became quite famous.  Readily recognizable, Indiana's "LOVE" has been depicted in various artistic media, such as prints, silkscreens, and sculptures, and it was even featured on United States postage stamps.  Originally from the Midwest, Indiana relocated from New York, where he had lived for a time, to Vinalhaven, an island off the coast of Maine.  He lived there from 1976 until his death on August 9, 2018.

Michael McKenzie ("McKenzie"), an art publisher, began collaborating with Indiana in the mid-1970s.  In 2008, in the course of this ongoing relationship, McKenzie (operating through American Image Art ("AIA")) created "HOPE" artwork -- images of the word "hope" laid out in the same format as Indiana's "LOVE" artwork -- and McKenzie wanted to work with Indiana to make color

---

[1]  Because this matter has its genesis in a motion seeking "to compel arbitration and stay federal-court proceedings, 'we draw the relevant facts from the operative complaint and the documents submitted to the district court in support of' that 'motion.'"  Toddle Inn Franchising, LLC v. KPJ Assocs., LLC, 8 F.4th 56, 59 n.1 (1st Cir. 2021) (quoting Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018)).

variations of it.  The ensuing HOPE collaboration between Indiana and McKenzie led to a 2008 publishing agreement between the two (sometimes called the "Agreement for Art Editions contract," sometimes the "HOPE agreement," but we'll refer to it here as "the 2008 Agreement"), and that contract is what allowed McKenzie and AIA to produce HOPE sculptures, paintings, objects, and prints. The 2008 Agreement lays out the responsibilities of AIA and Indiana in this collaboration and details the specifics of art production. Important to the debate before us today is the 2008 Agreement's arbitration provision, which provides:  "Any disputes will be settled by arbitration through the American Arbitration Association [("AAA")], governed by the laws of the State of New York."

Indiana and McKenzie operated under the 2008 Agreement until Indiana died, at which point the rights and obligations of Indiana passed to his estate ("the Estate"), with James W. Brannan ("Brannan") serving as the Estate's personal representative.

Indiana's LOVE artwork, not to mention his many other highly acclaimed works of art, brought him significant financial success -- one need look no further than the $89,738,458.38 fortune borne out in his probate records to confirm as much.  Indiana bequeathed that entire estate (minus any claims and debts) to The

Star of Hope, Inc. ("Star of Hope"), a nonprofit in Vinalhaven that aims to promote visual-arts education.[2]

### B. The Initial Disputes and Resulting Proceedings

Right around the time of Indiana's death in 2018, various disagreements between a handful of different people and entities affiliated with the artist began to surface. The one with which we are concerned -- McKenzie and the Estate sparring over the 2008 Agreement's production-rights terms, i.e., the dispute from which the issue now on appeal stemmed -- actually began as crossclaims in a Manhattan-federal-court (S.D.N.Y.) action in which a company called Morgan Art Foundation (an offshore Bahamian entity) sued McKenzie (d/b/a AIA) and Indiana (naming the Estate after Indiana's passing) under a breach of contract theory.[3] See Morgan Art Found. Ltd. v. McKenzie, No. 2018-cv-04438, 2020 WL 6135113, at *1 n.1

---

[2] Because Star of Hope is a Maine charity, Aaron M. Frey ("Frey"), Maine's Attorney General, was joined as a defendant in his official capacity pursuant to Maine Revised Statutes, Title 5, § 194(4), which instructs that the Attorney General "must be made a party to all judicial proceedings in which the Attorney General is interested in the performance" of his duties, including the duty to "enforce due application of funds given or appropriated to public charities within the State and prevent breaches of trust in the administration of public charities," Me. Rev. Stat. Ann. tit. 5, § 194(2). While Frey was involved in the litigation below, as we'll explain, we note that Frey has not appealed the district court's decision, takes no position on the appeal, and has not participated in the appeal.

[3] Between Morgan, McKenzie, the Estate, and other parties to the Morgan lawsuit, claims, crossclaims, and counterclaims abound. But for our purposes, we need not concern ourselves with anything beyond the dispute between McKenzie and the Estate.

(S.D.N.Y. Oct. 18, 2020). In answering that suit, McKenzie cross-claimed against the Estate -- he alleged that the 2008 Agreement authorized McKenzie to produce and sell the subject artwork. The Estate's response was a motion to compel arbitration on McKenzie's claims, filed pursuant to the 2008 Agreement. Eventually, McKenzie and the Estate, though remaining parties to the Morgan case, "agree[d] [the 2008 Agreement] govern[ed] the claims between them," and therefore their crossclaims against each other should be sent to arbitration before an AAA panel in New York in accordance with the 2008 Agreement's arbitration clause (which, recall, provided that "[a]ny disputes will be settled by arbitration through the [AAA]"). The Estate's motion to compel that arbitration was granted.

And so, off they went to put the wheels of the arbitration scheduling machine in motion. We refer to the resulting arbitration as the "New York arbitration." As that got underway, though, a new dynamic sprouted in the north. Anticipating the significant expense of the New York arbitration and its associated proceedings, and concerned that those expenses (not to mention the cost of the ongoing S.D.N.Y. litigation) were cutting into funds that should be going to Star of Hope, Frey tapped in. In intervening from Maine, Frey parlayed an alternative dispute resolution discussion that was taking place in the Maine state court case probating Indiana's will, into an agreement

between McKenzie and the Estate (and others) to take their quarrels before a mediator.

### C.  The Mediation, Resulting Term Sheet, and Aftermath

In late November 2019, after a two-day mediation in Portland, Maine, McKenzie and the Estate left the proceeding with a signed document titled "Confidential and Binding Term Sheet" (we'll call this the "2019 Term Sheet").[4]  The 2019 Term Sheet tackled a number of topics, like rights to publish and sell certain artwork, collaborations involving Indiana artwork and art production, authenticity determinations, and so on.  Pertinent to our mission today are these terms:

- "AIA and the Estate will enter into a new [production] agreement that will permit AIA the exclusive right to publish and sell authorized HOPE prints and sculptures";

- "[T]he Original HOPE Agreement [(the 2008 Agreement)] is terminated";

- "The [New York] arbitration between the Estate and AIA pending in the AAA will be dismissed with prejudice"; and

- "This term sheet is intended to be binding, and will be replaced by a more formal Settlement Agreement and Production Agreement.  Payments, releases, dismissals and other consideration under this term sheet will be made after a more

---

[4] Representatives from Frey's office attended the mediation.

- 8 -

formal Settlement Agreement and Releases and Production Agreement are executed."

The day after the parties left the mediation, counsel for the Estate emailed the New York arbitration panel: "We are pleased to report that the parties have signed a term sheet that resolves all claims and counterclaims in this action. The parties request a one-month adjournment . . . to allow time for the preparation and execution of the settlement agreement and related documentation."

Evidently, attempts to arrive at the contemplated "more formal" agreement didn't pan out,[5] so the Estate recommenced the New York arbitration. Operating from the position that the 2019 Term Sheet was the enforceable contract in place -- and, through it, the parties had agreed to terminate both the 2008 Agreement

---

[5] The record reflects that the parties attempted to fashion the "more formal Settlement Agreement and Production Agreement" to replace the 2019 Term Sheet, but those efforts broke down. McKenzie says this owes to the Estate's significant delay, followed by rounds of proposed revisions and additions by the Estate that amounted to the Estate "walk[ing] away from the substantive provisions" of the 2019 Term Sheet. And, as we'll discuss more later, the Estate's position (taken here and below) is that the 2019 Term Sheet wasn't binding or enforceable, and, even if it was, McKenzie breached and repudiated it soon after it was signed -- McKenzie did so, the Estate says, by flouting its confidentiality and non-disparagement terms, refusing to accept key settlement terms, rejecting the Estate's draft of the final settlement agreement, and refusing to negotiate a separate production agreement.

and the New York arbitration -- McKenzie took action in the District of Maine to stop the arbitration from resuming.

### D.  Maine District Court and the New York Arbitration

Back in the Pine Tree State, McKenzie filed a complaint and, with that, triggered a flurry of motion practice.  The complaint fired off a single shot -- one count seeking declaratory and injunctive relief.  McKenzie wanted (and still seeks) a judgment declaring the 2019 Term Sheet "contractually binding" and "specifically enforceable," as well as an order staying and enjoining the parties from continuing the New York arbitration. The thrust of his pleading is:  the 2019 Term Sheet is valid, binding, enforceable, and resolved all the parties' disputes about production; it provided that the pending New York arbitration was to be dismissed with prejudice, so the New York arbitration should not go forward; and any dispute about the 2019 Term Sheet's enforceability should be handled by the court.  In response, the Estate moved pursuant to the Federal Arbitration Act ("FAA") to compel arbitration and also to stay proceedings in district court, or, alternatively, at least to stay the action pending a decision by the New York arbitration panel on the topic of arbitrability of the parties' dispute. The Estate's argument in favor of compelling arbitration was:  the 2019 Term Sheet was not binding because it was subject to further negotiation and did not represent a formal settlement agreement; but the parties were bound by the 2008

Agreement, which directed "[a]ny disputes" to arbitration; and any lingering doubts about arbitrability needed to be sorted out by the arbitrators, not the court.

McKenzie's motion for a preliminary injunction came next, laying out his argument that the Estate should not be permitted to proceed with the New York arbitration until the dispute described in his complaint was resolved since the parties' dispute was founded on his stance that the valid, enforceable, and superseding 2019 Term Sheet "not only does not agree to arbitration, it provides that the existing arbitration commenced under the earlier [2008] Agreement should be dismissed." That filing was followed by McKenzie's opposition to the Estate's motion to compel and stay, which similarly offered up arguments that the 2019 Term Sheet was binding and superseded the 2008 Agreement and that arbitrability of the 2019 Term Sheet dispute was for the court to decide. And, unsurprisingly, the Estate lobbed up an opposition to McKenzie's motion for a preliminary injunction.[6]

In fielding all of this, the district court kicked off its analysis by acknowledging the central question -- "whether the Mediation Term Sheet is enforceable and supersedes the 2008 Agreement" -- but then explained that question was actually "a

_____

[6] Frey chimed in along the way too, but since he is not participating on appeal and his various arguments below primarily mirrored those of either the Estate or McKenzie (depending on the issue), there is no need to sum up his submissions here.

- 11 -

secondary" one.  McKenzie v. Brannan, 496 F. Supp. 3d 518, 532, 533 (D. Me. 2020).  Specifically, in view of "the language from the 2008 Agreement's arbitration clause," the district court wrote, the 2019 Term Sheet's enforceability is secondary to "[t]he first question and the one that resolves this motion," which, the district court said, "is who decides whether the claims are arbitrable -- a gateway question known as 'arbitrability.'"  Id. at 533 (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002); Fantastic Sams Franchise Corp. v. FSRO Ass'n Ltd., 683 F.3d 18, 24-25 (1st Cir. 2012)).  The district court explained that it needed to "determine whether the 2008 Agreement delegates the authority to decide arbitrability to the arbitrator rather than the Court," then concluded "that the 2008 Agreement's arbitration clause directs an arbitrator, rather than this Court, to determine the threshold question of whether the dispute regarding the enforceability of the Mediation Term Sheet is arbitrable."  Id.  It arrived at this conclusion by looking at the 2008 Agreement's "direct and broad delegation language," which the district court said showed "clear and unmistakable intent to have an arbitrator decide whether the Mediation Term Sheet is enforceable and whether the 2008 Agreement has been superseded [or] remains valid."[7]  Id. at 535.

---

[7] The district court's thorough decision went on to analyze the 2008 Agreement, focusing on incorporation versus mention of

- 12 -

Given its construction of the analysis to be done, the district court did not "make any findings regarding whether this dispute is arbitrable or whether the Mediation Term Sheet is enforceable." Id. at 533. But in an even-if exercise, the district court indicated that, "to the extent Mr. McKenzie argues that the 2008 Agreement terminated and is no longer valid, the Court concludes that the arbitration clause would still be effective" -- just because an agreement terminates, it doesn't necessarily mean the duty to arbitrate went down with the terminated contract. Id. at 539 (citing Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 512-514 (1st Cir. 2020) (discussing the severability of an arbitration clause from a terminated contract and the presumption that an arbitration clause survives the termination of the underlying contract, absent a challenge to the arbitration agreement itself)). But, since McKenzie asserted that the 2008 Agreement wasn't just terminated, but rather was totally replaced by the 2019 Term Sheet, the district court went on to remark that the arguments on this point presented "a conundrum":

> if the Mediation Term Sheet is enforceable, then it is arguably a replacement contract that supersedes the 2008 Agreement and precludes arbitration; if the Mediation Term Sheet is not enforceable, then the 2008 Agreement

AAA rules, as well as our precedent on the topic. McKenzie, 496 F. Supp. 3d at 535-36. We don't need to detail or get into any of that, though, given our outcome today.

- 13 -

and its arbitration clause are completely intact.  <u>The problem is that to reach the merits of this issue, the Court would first have to conclude that the issue is not arbitrable and the Court just ruled that the AAA, not this Court, must resolve the gateway issue of arbitrability</u>.  Based on its conclusion that the AAA Panel should decide arbitrability, the Court declines to issue an advisory opinion on an eventuality that may not occur.

Id. at 541 (emphasis added).

These analyses guided the district court's procedural outcomes on the pending motions as follows:  it granted the Estate's motion to compel arbitration and stay proceedings, id. at 540; it dismissed McKenzie's motion for a preliminary injunction as moot (because the arbitrators would decide arbitrability of the dispute), id. at 541; and it instructed that, if "the AAA Panel determines that the dispute is arbitrable and proceeds to the merits, the Court will likely dismiss the case without prejudice since 'all claims asserted in the case' will have been found arbitrable," id. at 540 (quoting Next Step Med. Co., Inc. v. Johnson & Johnson Int'l, 619 F.3d 67, 71 (1st Cir. 2010)).

From there, the arbitrability question went to the AAA panel in New York, which concluded that the parties' dispute was subject to the 2008 Agreement's arbitration provision, meaning the clash over the 2019 Term Sheet (whether it can/should be specifically enforced) would need to be arbitrated.  That triggered the district court's issuance of a show-cause order asking the parties to explain why the case shouldn't be dismissed, but

- 14 -

everyone agreed to dismissal.  And so the case was dismissed (without prejudice) and proceeded to an evidentiary hearing before the AAA panel.[8]

This timely appeal followed, with McKenzie taking aim at the district court's grant of the motion to compel arbitration, the dismissal of McKenzie's motion for a preliminary injunction, and the eventual dismissal of the Maine case.

## II.  The FAA and Our Review

We begin our work by laying out the legal backdrop against which our review must play out, starting with the FAA.  "A written provision in . . . a contract . . . to settle by arbitration a controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "Designed to counter 'widespread judicial hostility to arbitration,' the Act makes arbitration 'a matter of contract, and courts must enforce arbitration contracts according to their terms.'"  Biller, 961 F.3d at 508 (first quoting Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 232 (2013), then quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019)).

"We review both the interpretation of arbitration agreements and orders compelling arbitration de novo."  Id.

---

[8] On this record, the current status of the New York arbitration is unclear.

- 15 -

(quoting S. Bay Bos. Mgmt. v. Unite Here, Local 26, 587 F.3d 35, 42 (1st Cir. 2009)). And when, as here, a party "seek[s] to compel arbitration under the FAA," that party "must demonstrate [(1)] 'that a valid agreement to arbitrate exists, [(2)] that the movant is entitled to invoke the arbitration clause, [(3)] that the other party is bound by that clause, and [(4)] that the claim asserted comes within the clause's scope.'" Id. (quoting Dialysis Access Center, LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011)); see also Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 27 (1st Cir. 2021). Then, "[i]f the movant makes that showing, the court has to send the dispute to arbitration," Biller, 961 F.3d at 508 -- that is, "unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself . . . or claims that the agreement to arbitrate was 'never concluded,'" Granite Rock Co. v. Int'l Bhd. Of Teamsters, 561 U.S. 287, 301 (2010) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 n.1 (2006)) (cleaned up).

### III. DISCUSSION

Before us, the parties' arguments have not changed. So, having already spelled them out in considerable detail, we forge ahead.

As always in arbitrability cases, there are disputes upon disputes, questions embedded within questions, and disputes about who should be answering those questions. This case very

- 16 -

much fits that mold, with the parties squabbling over:  the role, if any, to be played by the 2019 Term Sheet; whether the parties are bound by an agreed-upon arbitration provision that committed their dispute to arbitration; and who (the court or the arbitrators) should decide whether the parties agreed to arbitrate these disputes.

Fortunately, we are not without guidance as to how to approach these "three types of disagreement."  First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942 (1995).  First, McKenzie and the Estate disagree about specific enforcement of the 2019 Term Sheet, i.e., what the parties' respective rights and obligations are (if any)[9] under the terms of that document -- "[t]hat disagreement makes up the merits of the dispute."  Id. at 942.  "Second, they disagree about whether they agreed to arbitrate the merits.  That disagreement is about the arbitrability of the dispute."  Id.  And "[t]hird, they disagree about who should have the primary power to decide the second matter," id. -- whether

_____

    [9]  Keep in mind:  the Estate maintains that the 2019 Term Sheet isn't binding -- and this assertion has a role to play at multiple levels of analysis.  Essentially, the "it's not binding" argument at once posits that the 2008 Agreement's arbitration provision is intact since the non-binding 2019 Term Sheet didn't terminate or supersede the 2008 Agreement, and that same "it's not binding" argument also supports the Estate's merits argument that it isn't obligated to perform under the 2019 Term Sheet.

it's for the court or the arbitrators to decide whether the parties agreed to "arbitrate arbitrability," id. at 944, so to speak.[10]

As we'll explain, our job today is confined to that last inquiry -- the "who decides" question. We conclude that the court -- not the AAA -- holds the decision-making power to decide whether the parties intended to arbitrate this dispute.

## Who has the power to decide whether the parties agreed to arbitrate arbitrability?

The Estate urges that the parties clearly agreed to have an arbitrator decide all disputes -- including the gateway question of "who decides" what the parties agreed -- and that agreement should be construed in favor of arbitration. Just look at the 2008 Agreement's broad arbitration language, the Estate urges --

---

[10] These complex arbitrability cases have one thing in common -- the analysis is dictated by what the parties can (or can't, as the case may be) show they agreed to do. And that makes sense:

> Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question "who has the primary power to decide arbitrability" turns upon what the parties agreed about that matter. Did the parties agree to submit the arbitrability question itself to arbitration? . . . If . . . the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently. These two answers flow inexorably from the fact that arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration.

Id. at 943 (citations omitted) (third emphasis added).

it delegated arbitrability of disputes just like this one to New York AAA arbitrators. Therefore, according to the Estate, we need look no further than the 2008 Agreement and its arbitration clause.[11]

But McKenzie says the Estate can't show the existence of a currently valid agreement to arbitrate -- the 2019 Term Sheet superseded and "terminated" the 2008 Agreement and its arbitration provision, did not commit the parties to a new arbitration agreement, and clearly showed the parties' agreement to "dismiss[]" with prejudice" the ongoing New York arbitration. Add all of this up, and there's plenty of evidence the parties meant to terminate both the arbitration clause and the underlying contract: "If there is no contractual agreement to arbitrate," McKenzie reasons, "that is for the court to determine, not the arbitrator." Plus, McKenzie points out, there's a presumption that applies to this kind of dispute -- one that commits resolution of this "is there an arbitration agreement even in place" debate to courts to decide, not arbitrators. Accordingly, McKenzie asserts that the dispute

---

[11] The Estate tucks a waiver argument into a footnote at the back end of its brief, asserting that "McKenzie appears to challenge the validity of the arbitration clause here for the first time on appeal." We disagree. McKenzie challenged the arbitration clause below, arguing (as he does now) that the arbitration-clause-free 2019 Term Sheet did away with the parties' obligation to arbitrate when it superseded the 2008 Agreement. And the district court clearly understood that argument to be before it when it issued its decision. See, e.g., McKenzie, 496 F. Supp. 3d at 532, 539.

should not have gone to arbitrators, and the district court erred in concluding otherwise.

We employ a presumption that courts (not arbitrators) must "resolve gateway disputes about whether a particular arbitration clause binds parties in a particular case." Barbosa v. Midland Credit Mgmt., Inc, 981 F.3d 82, 93 n.13 (1st Cir. 2020); see also BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 34 (2014) (quoting Howsam, 537 U.S. at 84) (observing that "courts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about 'arbitrability,'" including questions like "whether the parties are bound by a given arbitration clause"); Biller, 961 F.3d at 516 n.11 (quoting Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 71 (2010)) (explaining that it is for the court to consider challenges to "'the precise agreement to arbitrate at issue,' namely the agreement providing for arbitration of the validity of the arbitration clause").

Granted, to get around this presumption, "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy[, but they] must do so . . . by 'clear and unmistakable' evidence." Biller, 961 F.3d at 509 (quoting Henry Schein, Inc., 139 S. Ct. at 529, 530); see also Rent-A-Ctr., 561

U.S. at 68-69. Indeed, "[u]nless the parties clearly and unmistakably provide otherwise," Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 7 (1st Cir. 2014) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)), "the court must resolve a disagreement among the parties as to whether an arbitration clause applies to a particular dispute," id. (citing Granite Rock, 561 U.S. at 299-300).

And all of this is based on good policy: "the first principle that underscores all of the Supreme Court's arbitration decisions is that '[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration.'" Dialysis Access Ctr., 638 F.3d at 376 (quoting Granite Rock, 561 U.S. at 299). Accordingly,

> courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue. Where a party contests either or both matters, "the court" must resolve the disagreement.

Id. (quoting Granite Rock, 561 U.S. at 299-300) (cleaned up) (second emphasis added).

The presumption operates with full force in this case, and there's no clear and unmistakable evidence that the parties agreed otherwise. The Estate would have us look to the 2008 Agreement and its "broad" arbitration clause delegating the

- 21 -

decision-making power to an arbitrator to resolve the dispute at hand (and all disputes, for that matter). And the Estate highlights the arbitration-friendly federal policy on which the district court relied, McKenzie, 496 F. Supp. 3d at 532; citing the FAA, the Estate urges that when parties have agreed to arbitrate, courts must enforce those agreements. Here, the Estate says, the parties clearly agreed to require "AAA arbitration for all disputes," including gateway disputes about who should decide arbitrability of their disputes.

If the 2019 Term Sheet didn't exist, these arguments might persuade. But the 2019 Term Sheet does exist, and the Estate's contentions here ignore that simple fact -- each of its arguments operates from the "foundation" that the 2008 Agreement shows intent to arbitrate and thus requires any disputes be sent to arbitration, and "[t]he parties never have disputed the enforceability or validity of the 2008 Agreement's arbitration clause."

Until now. Just because McKenzie never contested the arbitration provision before the 2019 Term Sheet came into existence doesn't mean he can't challenge it now.[12] In fact, it's

_____

[12] We pause here to observe more completely the Estate's point that, until he filed his complaint in the District of Maine, McKenzie never asserted that the 2019 Term Sheet was binding, instead continuing to litigate his case after the 2019 mediation concluded. Here's the thing: as the parties well know, that's how litigation works. The record bears out that, in the months

- 22 -

precisely because the 2019 Term Sheet came into existence that McKenzie now challenges the 2008 Agreement's arbitration clause. The Estate may be right that the 2008 Agreement's arbitration provision is broad and could conceivably cover the parties' dispute here. But that's true only if the 2008 Agreement and its arbitration provision are still in effect. And the Estate may be right that, as a policy matter, arbitration is often favored. But not always. The important context for that policy is that it came about in response to courts' resistance to arbitration, Biller, 961 F.3d at 508 (quoting Am. Express Co., 570 U.S. at 232), and the policy presumes the existence of an actual agreement, Bossé, 992 F.3d at 31 (pointing to the policy favoring "arbitration agreements"), which of course is the central, underlying problem McKenzie urges here -- there is no such agreement he says, because the 2019 Term Sheet showed the parties' intent to terminate the old agreement, its arbitration provision, and the parties' current New York arbitration obligations.[13]

---

that followed the mediation, the parties were engaged in negotiations to finalize the 2019 Term Sheet (as already noted, ultimately, those negotiations didn't pan out). While that happened, though, the litigation and arbitration proceedings were still going on. McKenzie could not simply check out on those proceedings, but rather had to continue engaging with any non-stayed pending matters. When he assessed that the 2019 Term Sheet negotiations were not going according to plan, he commenced this action.

[13] The issue here isn't about the scope of the agreement; it's about the existence of an agreement. Cf. Bossé, 992 F.2d at 31 (citations omitted) (parsing Supreme Court case law to explain

This is all about what the parties clearly agreed and intended, remember. See Biller, 961 F.3d at 509 (quoting Henry Schein, Inc., 139 S. Ct. at 529, 530). McKenzie's claim that the parties intended the 2019 Term Sheet to supersede and terminate both the 2008 Agreement and its arbitration clause means we can't look at the 2008 Agreement in isolation, ignoring the potential impact of the 2019 Term Sheet on the parties' intent to be bound by an earlier agreement to send a dispute like this to arbitration. See, e.g., BG Grp., PLC, 572 U.S. at 34 (quoting Howsam, 537 U.S. at 84) ("[C]ourts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about 'arbitrability,'" including questions like "whether the parties are bound by a given arbitration clause."). This is why, contrary to the Estate's insistence otherwise, the 2008 Agreement does not provide the requisite "clear and unmistakable evidence" of an agreement to have a gateway question like this fielded by arbitrators -- McKenzie's supportable arguments as to the 2019 Term Sheet directly challenge the 2008 Agreement and its arbitration clause as "clear and unmistakable" evidence of an agreement to arbitrate. And because he challenges the applicability and enforceability of the 2008 Agreement's

---

that the policy favoring arbitration applies to doubts about the scope of arbitrable issues; so if an agreement to arbitrate exists, but a dispute over scope of that agreement arises, we presume those matters are arbitrable).

arbitration provision, "the court must resolve [the] disagreement . . . as to whether [the] arbitration clause applies." <u>Grand Wireless, Inc.</u>, 748 F.3d at 7 (citing <u>Granite Rock</u>, 561 U.S. at 299-300).

Add to all of this that our precedent -- and helpful guidance from our sister circuits, too -- instructs that review of a superseding-contract argument like this one is for the courts. "[A] claim [(like McKenzie's)] that two parties later agreed to extinguish their arbitration pledge (specifically) is for the courts to decide." <u>Biller</u>, 961 F.3d at 514 (citing with approval <u>Dasher</u> v. <u>RBC Bank (USA)</u>, 745 F.3d 1111, 1121 (11th Cir. 2014)); <u>see also</u> <u>Jaludi</u> v. <u>Citigroup</u>, 933 F.3d 246, 255 (3d Cir. 2019) (explaining that "the question of whether a later agreement supersedes a prior arbitration agreement is tantamount to whether there is [still] an agreement to arbitrate" in the first place). That's exactly what we have here:  McKenzie claims that the 2019 Term Sheet represents an agreement to terminate and supersede the 2008 Agreement and extinguish the parties' arbitration agreement.

Given this, plus the presumption that courts hold the decision-making power when it comes to whether parties are bound by an arbitration clause, <u>see, e.g.,</u> <u>BG Grp., PLC</u>, 572 U.S. at 34–35 (quoting <u>Howsam</u>, 537 U.S. at 84); <u>Biller</u>, 961 F.3d at 516 n.11 (quoting <u>Rent-A-Ctr.</u>, 561 U.S. at 71), and because McKenzie points to the 2019 Term Sheet to "contest" whether the 2008 Agreement's

arbitration clause is enforceable, it is the court, not the arbitrators, who must "resolve [this] disagreement," Dialysis Access Ctr., 638 F.3d at 376 (quoting Granite Rock, 561 U.S. at 300) (cleaned up).

**What Comes Next**

Given our reasoning, we remand so the district court can tackle the fact-intensive question (whether the parties agreed to arbitrate arbitrability of the merits dispute), which will require resolution of the intertwined concepts driving this case: whether the 2019 Term Sheet is a superseding contract that terminated the 2008 Agreement and extinguished its arbitration provision and the obligation to continue the New York arbitration. See, e.g., Fid. & Guar. Ins. Co. v. Star Equip. Corp., 541 F.3d 1, 5 (1st Cir. 2008) (explaining that a "trial court may summarily enforce [a settlement] agreement, provided that there is no genuinely disputed question of material fact regarding the existence or terms of that agreement"; but, when there are genuine disputes about material facts regarding "the existence or terms of [a settlement] agreement," "the court should hold a hearing and resolve the contested factual issues"); see also In re Estate of Snow, 99 A.3d 278, 282, 284 (Me. 2014) (quoting Muther v. Broad Cove Shore Ass'n, 968 A.2d 539, 541 (Me. 2009)) (observing that "[s]ettlement agreements are analyzed as contracts, and the existence of a binding settlement is a question of fact"; so "in circumstances

- 26 -

where litigants dispute whether an enforceable settlement was reached outside the presence of the court, findings of fact regarding the terms of the agreement and the parties' intent may be required"); Marie v. Renner, 946 A.2d 418, 420 (Me. 2008) (reasoning that the ambiguity of the record necessitated an evidentiary hearing so it could be determined whether an enforceable settlement agreement existed).

## A Few Words on McKenzie's
## Arbitration-Clause Challenge and Severability

Before we go, we tie up one slightly loose end. Recall the district court's observation that, "[e]ven assuming that the underlying [2008 A]greement terminated or was rightfully rescinded, 'that would not mean [the parties'] duties to arbitrate their contract-related disputes ended, too.'" McKenzie, 496 F. Supp. 3d at 539 (quoting Biller, 961 F.3d at 512-13) (third alteration in original) (discussing the severability of an arbitration clause from a terminated contract and the presumption that an arbitration clause survives the termination of the underlying contract, absent a challenge to the arbitration agreement itself). "Accordingly," the district court went on, "to the extent Mr. McKenzie argues that the 2008 Agreement terminated and is no longer valid, the Court concludes that the arbitration clause would still be effective." Id. (emphasis added). In so doing, the district court looked to Biller's point that, "when

someone argues . . . that a broad arbitration clause is invalid or unenforceable only on a ground that directly affects the entire agreement that challenge is ordinarily for the arbitrator to decide." Id. (quoting Biller, 961 F.3d at 512-13) (omission in original). Implicit in this aside is that the district court presumed, at least for that moment, that McKenzie had challenged the 2008 Agreement "only on a ground that directly affects the entire agreement." Id. (quoting Biller, 961 F.3d at 512-13) (emphasis added).

This very brief "to the extent," even-assuming moment, though, is immediately followed by the district court's clear recognition that McKenzie wasn't arguing that the 2008 Agreement was "simply 'terminated.'" Id. Rather, his contention was that the 2008 Agreement "was completely replaced by the [2019] Term Sheet," i.e., the superseding-contract argument related both to the 2008 Agreement globally and specifically as to the arbitration provision. Id. (citing Biller, 961 F.3d at 514). This is an important distinction, and one Biller makes clear: the appellants there made only a sweeping challenge to the (self-terminating, mind you) underlying agreement rather than mounting an independent attack on the arbitration agreement itself -- they argued the agreement "expired only on the grounds that the contract containing the arbitration agreement terminated," and neglected to do anything more, like "identify[] evidence that the parties intended

- 28 -

not only the [underlying] agreement but also their <u>arbitration obligations</u> to lapse." 961 F.3d at 513-14.

Reading all of this together, then, we do not take the district court's "even assuming" and "to the extent" lines to mean that it has concluded, as a matter of fact and law, that McKenzie did not "mount an 'independent' challenge to the arbitration agreement" as our case law requires. <u>Id.</u> at 514. All it seems to have concluded is that if McKenzie was arguing that the arbitration clause terminated only because the 2008 Agreement terminated, "the arbitration clause would still be effective"; as the district court immediately observed, though, that isn't the sum total of what McKenzie is really saying. <u>McKenzie</u>, 496 F. Supp. 3d at 539.

So McKenzie's argument on this point -- that there is evidence of the parties' clear intent that the 2008 Agreement's termination, taken together with the dismissal of the ongoing New York arbitration and the 2019 Term Sheet's silence on arbitration, meant that the parties had "extinguished" all arbitration obligations, <u>Biller</u>, 961 F.3d at 514 -- is ripe for consideration as part of the work to be done on remand. Ditto the Estate's retort that McKenzie has not, in fact, carried that "targeted, independent challenge" burden. And we decline to weigh in.

Indeed, all of this goes to the very "conundrum" the district court identified: does the 2019 Term Sheet supersede the 2008 Agreement and specifically extinguish the arbitration

provision; or is it an unenforceable writing that could not have terminated either the 2008 Agreement or its arbitration agreement? Originally, the district court didn't reach this because it concluded that the arbitrators needed to handle the gateway issue of arbitrability. McKenzie, 496 F. Supp. 3d at 539. Given our earlier analysis, the "conundrum" now falls to the district court to navigate.

## IV. CONCLUSION

For all of the reasons we detailed above, we vacate the grant of the motion to compel arbitration, the dismissal of the complaint, and the dismissal of the request for a preliminary injunction, and we remand for further proceedings consistent with this opinion. Each side to bear its own costs.